STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Vanessa D. HUGHES, Defendant-Appellant.

Supreme Court

*No. 97–1121–CR. Oral argument October 5, 1999.—Decided
March 17, 2000.*

2000 WI 24

(Also reported in 607 N.W.2d 621.)

281

For the plaintiff-respondent-petitioner the cause was argued by *Thomas J. Balistreri*, assistant attorney general with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Andrea Taylor Cornwall*, assistant state public defender.

¶ 1. DIANE S. SYKES, J. This case involves a warrantless police entry into a home. The officers in question were at the threshold of the defendant's apartment about to investigate a complaint of trespassing when the door was unexpectedly opened, and they immediately detected a strong odor of marijuana coming from inside. The officers also deduced a distinct possibility that any evidence of the drug would be destroyed if they did not immediately enter, since the people in the apartment were now alerted to their presence. The question in the case is, under these circumstances, does the combination of the strong odor of marijuana coming from the apartment, and the knowledge on the part of the occupants that the police are standing outside, amount to exigent circumstances justifying the warrantless entry and subsequent search? We hold that it does, and therefore reverse the court of appeals decision that reversed the circuit court's order upholding this search.

¶ 2. The relevant facts are as follows.[1] Sometime between 4:30 p.m. and 6:00 p.m. on June 4, 1996, City of Milwaukee Police Officers Brad Schlei and Scott

---

[1] The facts in this case are disputed. At the suppression hearing the testimony given by the defendant and her family members often conflicted with the testimony given by the officers. The trial court made a finding of credibility, stating:

I found [Officer Kurth's] testimony to be extremely credible. This officer, this lady, was telling the truth on the witness stand. I have no doubt about that. That means that some other people weren't telling the truth. It also means that there certainly was a consent to the personal search, simply on Officer Kurth's testimony. I

Marlock responded to a report of trespassing made by Richard Lucas, a security guard at the Windsor Court Apartments, 1127 North 18th Street. The officers knew the complex to be an area of heavy drug activity where the police had made many arrests and had conducted sweeps in the past.

¶ 3. Upon arriving at Windsor Court, the officers spoke directly with Lucas, who informed them that the apartment manager had a standing trespass complaint against Michael Webb, Danny Smith and Marvin Webb, who were not welcome there because of their involvement with illegal drugs and because they had caused trouble at the complex in the past. Lucas reported that he had seen Smith and Michael Webb on the premises and that they had entered Apartment 306, which was later identified as the defendant Vanessa Hughes' apartment. Officer Schlei was famil-

---

believe that, then in turn, supports the credibility of the other police officers in their testimony.

It is the function of the trier of fact, and not this court, to resolve questions as to the weight of testimony and the credibility of witnesses. *Estate of Dejmal*, 95 Wis. 2d 141, 151, 289 N.W.2d 813 (1980). This principle recognizes the trial court's ability to assess each witness's demeanor and the overall persuasiveness of his or her testimony in a way that an appellate court, relying solely on a written transcript, cannot. Thus, we consider the trial judge to be the "ultimate arbiter of the credibility of a witness," *Posnanski v. City of West Allis*, 61 Wis. 2d 461, 465, 213 N.W.2d 51 (1973), and will uphold a trial court's determination of credibility unless that determination goes against the great weight and clear preponderance of the evidence. *State v. Phillips*, 218 Wis. 2d 180, 186–87 n.4, 577 N.W.2d 794 (1998). We find no reason here to disturb the trial court's determination of credibility, which resolved factual discrepancies in favor of the officers' account.

iar with both men, and, in fact, had arrested Smith in the past.

¶ 4. The officers went to Apartment 306 to investigate. They knocked on the door. Although they could hear loud music and many voices inside the apartment, they received no response. Concerned by the apparent number of people inside the apartment, Officer Schlei decided to call for back up and await its arrival before knocking again.

¶ 5. As Schlei and Marlock waited in the hallway outside Apartment 306, the door suddenly opened and the officers were immediately confronted with (a) a very strong odor of marijuana coming from the apartment, and (b) a very surprised Veronica Hughes, the defendant's sister, who apparently was on her way to the store and did not expect to see two Milwaukee police officers in full uniform standing in the hallway. She tried to slam the door. The officers, now in possession of evidence of illegal activity beyond a mere trespass, and their presence having been revealed to those inside the apartment through no action of their own, were faced with a changed situation. Concerned that the people inside would destroy any drug evidence if an immediate entry were not undertaken, the officers prevented Veronica from closing the door and went in.[2]

---

[2] There is also testimony in the record from both Veronica and Vanessa Hughes that Veronica screamed when she saw the police; this, of course, would have very dramatically alerted the occupants of the apartment to the presence of the police and increased the urgent necessity of entry to prevent evidence destruction. However, it is not clear from the record whether Veronica screamed immediately upon seeing the officers or after they entered the apartment, and the trial court never made a finding on the subject.

¶ 6. There was initial chaos in the apartment. Seven or eight people were in the main room and two people began running down the hallway toward the back bedrooms of the apartment. For their safety, the officers ordered the occupants to put their hands up and remain still. All complied except for one Timothy Gibbs, who kept his hands near his pockets. Officer Schlei's frisk of Gibbs turned up cocaine. Officer Marlock attempted to determine who legally occupied the apartment. Vanessa Hughes volunteered that she was the legal tenant. Officer Schlei then took Hughes aside and explained that they wanted to search the apartment for any illegal drugs or drug paraphernalia. She consented. At some point after the officers entered the apartment, but before the search began, two back-up squads arrived to assist.

¶ 7. During the search, Hughes repeatedly taunted the officers. By her own testimony, she "got to yelling at the police." According to Michael Webb, Hughes was running around and "going off on the police." Hughes testified that she argued with the officers about putting her hands up and remaining still. She also refused to sit down when the officers told her to.

¶ 8. As the officers searched the apartment, Hughes repeatedly told them to go ahead and search, because they would find nothing. In fact, the officers found no marijuana.[3] However, they did find evidence of drug activity. In the garbage, they found the remains of a blunt, a cigar used to smoke marijuana by hollowing out the center and inserting the drug. They found numerous baggies with corner cuts, commonly used to

---

[3] Although the officers found no marijuana, Hughes admitted at the suppression hearing that people were in fact smoking marijuana in her apartment on June 4, 1996.

package illegal drugs. They also found a gram electronic digital scale with a white residue on it.

¶ 9. Schlei and Marlock summoned a female officer, Tina Kurth, to conduct a pat-down search of Hughes. When Kurth arrived, Hughes was seated at the kitchen table. Kurth testified that she approached Hughes about the search:

[Defense Counsel]: And you talked with her?

OFFICER KURTH: That's when I said, I'm here to search you. All right? And that's what—she's like, okay. And that was it. She was cooperative.

[Defense Counsel]: Did you tell her that she did not have to give you permission to search her?

OFFICER KURTH: No. I did not do that.

¶ 10. Due to the number of people in the kitchen, Kurth escorted Hughes into one of the bedrooms for the search. In the bedroom, before Kurth began the search, and without any prompting, Hughes lifted her skirt and stated that she was wearing a pad. Hughes stated that the lump in her underwear was Kleenex and removed it.

¶ 11. After Hughes removed the tissue, however, Kurth noticed another lump in Hughes' underwear, which she removed herself. The second lump was actually a clear plastic bag holding 22 individual corner-cuts containing crack cocaine and one larger chunk of crack cocaine. In all, the bag contained 5.39 grams of cocaine.

¶ 12. Hughes was charged with possession of a controlled substance (cocaine) with intent to deliver under Wis. Stat. §§ 161.16(2)(b)1 and

287

161.41(1m)(cm)2.[4] Hughes moved to suppress the evidence seized from her person as being the fruit of an illegal search of her apartment, alleging that the police entered her apartment without a warrant, searched without her consent, and that the search was not supported by probable cause or justified by exigent circumstances.

¶ 13. The trial court determined that the strong odor of marijuana coming from the apartment gave the officers probable cause to believe that a crime had been or was being committed on the premises and that there were sufficient exigent circumstances to justify the officers' entry without a warrant. In addition, the court found that Hughes consented to both the search of her property and of her person. On August 22, 1996, Hughes pled guilty to the charges against her. On October 29, 1996, she was sentenced to 24 months in prison.

¶ 14. Hughes appealed. In a summary disposition, the court of appeals reversed, finding that the search of Hughes' apartment violated her Fourth Amendment rights because it was not supported by probable cause, and the odor of burning marijuana, without further evidence of an exigency, did not justify the warrantless entry.

■

¶ 15. Review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact, which we review under two different standards. We uphold a circuit court's findings of fact unless they are clearly erroneous. *State v. Secrist*, 224 Wis. 2d 201, 207, 589 N.W.2d 387 (1999). We then independently apply the law to those facts *de novo*.

---

[4] Effective July 9, 1996, both statutes were amended and renumbered by 1995 Wis. Act 448, §§ 245 and 371 to Wis. Stat. §§ 961.16(2)(b)1 and 961.41(1m)(cm)2, respectively.

*State v. Kiekhefer*, 212 Wis. 2d 460, 475, 569 N.W.2d 316 (Ct. App. 1997).

¶ 16. This case presents us with a dilemma as old as the constitution itself: how best to balance the government's interest in law enforcement with the individual's right to be left alone. Although we generally give deference to the rights of the individual, we recognize that sometimes those rights must yield to the government's duty to enforce the law.

■

¶ 17. A police officer's warrantless entry into a private residence is presumptively prohibited by the Fourth Amendment to the United States Constitution,[5] and article I, section 11, of the Wisconsin Constitution.[6] However, this court and the United States Supreme Court have recognized exceptions to

[5] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[6] Article I, section 11 of the Wisconsin Constitution is identical in substance to the Fourth Amendment and states:

> The right of the people to be secure in their persons houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

This court follows the United States Supreme Court's interpretation of the search and seizure provision of the Fourth Amendment in construing the same provision of the state constitution. *State v. Fry*, 131 Wis. 2d 153, 171–72, 388 N.W.2d 565 (1986).

289

the warrant requirement where the government can show both probable cause and exigent circumstances that overcome the individual's right to be free from government interference. *Payton v. New York*, 445 U.S. 573, 575, 583–88 (1980); *State v. Smith*, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986). We find that the record in this case establishes both, and thus hold that the entry was permissible.

¶ 18. To determine whether the entry was lawful, we must answer two questions: first, did the officers have probable cause to believe that Hughes' apartment contained evidence of a crime, and second, did exigent circumstances exist at the time of the entry to establish an exception to the warrant requirement?

¶ 19. The Fourth Amendment requires probable cause to support every search or seizure in order to "safeguard the privacy and security of individuals against arbitrary invasions by government officials." *State v. DeSmidt*, 155 Wis. 2d 119, 130, 454 N.W.2d 780 (1990). Probable cause is a fluid concept, assuming different requirements depending upon its context. *County of Jefferson v. Renz*, 231 Wis. 2d 293, 304, 603 N.W.2d 541 (1999). This case concerns probable cause to search, not probable cause to arrest. Although the two concepts are sometimes treated interchangeably, they in fact require two distinct inquiries because they implicate distinct liberty interests. *Secrist*, 224 Wis. 2d at 209.

¶ 20. The probable cause requirement in the arrest context protects an individual's interest in his or her personal liberty. Thus, the proper inquiry in an arrest challenge is whether probable cause exists to believe that a particular suspect has committed a crime. *State v. Kiper*, 193 Wis. 2d 69, 82, 532 N.W.2d

698 (1995). This, however, is not an arrest but a search case.

■

¶ 21. In the search context the individual's privacy interest in his or her home and possessions is at stake. *Id.* at 83. In this context, the proper inquiry is whether evidence of a crime will be found. *Secrist*, 224 Wis. 2d at 209 (citing 2 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 3.1(b), at 7–8 (3d ed. 1996)). The quantum of evidence required to establish probable cause to search is a "fair probability" that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238 (1983).

¶ 22. The unmistakable odor of marijuana coming from Hughes' apartment provided this fair probability. Many cases have addressed the situation in which an officer relies upon his or her sense of smell to detect the presence of illegal drugs. *See Kiekhefer*, 212 Wis. 2d at 479 (odor of marijuana emanating from bedroom provided officers with probable cause to obtain a search warrant); *State v. Brockman*, 231 Wis. 634, 641–42, 283 N.W. 338 (1939)(distinctive odor of fermenting mash detected by officers was sufficient to support a magistrate's finding of probable cause justifying the issuance of a search warrant); *Secrist*, 224 Wis. 2d at 210 ("unmistakable odor of marijuana" emanating from a car provided probable cause for an officer to believe that the car contained evidence of a crime and thus to search). The United States Supreme Court has also recognized that "[the odor of a controlled substance] might very well be found to be evidence of the most persuasive character" in finding probable cause to issue a search warrant. *Johnson v. United States*, 333 U.S. 10, 13 (1948).

¶ 23. When the strong smell of marijuana is in the air, there is a "fair probability" that marijuana is present. This is common sense. In this case, the officers also knew that the building was an area of high drug activity and that the security guard saw two men entering the apartment who were not welcome at the complex because of their illegal drug activity. In deciding whether actions are permissible under the Fourth Amendment, we need only determine that the actions of law enforcement were reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990). Under these circumstances, it was entirely reasonable to conclude that evidence of illegal drug activity would probably be found in Apartment 306.

¶ 24. Once probable cause to search has been established, the state must also demonstrate exigent circumstances to justify the warrantless entry into the apartment. The objective test for determining whether exigent circumstances exist is whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape. *Smith*, 131 Wis. 2d at 230.

¶ 25. In *Smith*, we recognized four circumstances which, when measured against the time needed to obtain a warrant, constitute the exigent circumstances required for a warrantless entry. *Id.* at 229. Those circumstances are (1) an arrest made in "hot pursuit," (2) a threat to safety of a suspect or others, (3) a risk that evidence will be destroyed, and (4) a likelihood that the suspect will flee. *Id.*

¶ 26. The State says that the third factor, the risk of destruction of evidence, is implicated in this

case. We agree. The strong odor of marijuana that hit the officers as the door to the defendant's apartment was opened gave rise to a reasonable belief that the drug—the evidence—was likely being consumed by the occupants and consequently destroyed. But the greater exigency in this case is the possibility of the intentional and organized destruction of the drug by the apartment occupants once they were aware of the police presence outside the door. Marijuana and other drugs are highly destructible. Hughes has conceded as much. It is not unreasonable to assume that a drug possessor who knows the police are outside waiting for a warrant would use the delay to get rid of the evidence.

¶ 27. Hughes argues that the Supreme Court's decision in *Johnson* requires us to invalidate this appeal because a warrantless entry is not permitted solely on the basis of the smell of burning drugs. But we do not base our finding of exigent circumstances on the marijuana odor alone, and so *Johnson* is distinguishable. We have in this case an additional and important factor that was not present in *Johnson*: the suspects here were fully aware of the presence of the police. In *Johnson*, the police smelled burning opium while they were standing in the hallway outside Johnson's closed hotel room door; the defendant was unaware of their presence. *Johnson*, 333 U.S. at 12. Thus, the only risk of evidence destruction implicated in *Johnson* is that associated with the burning of the drug in order to consume it, rather than the risk of intentional destruction of the drug in order to avoid its discovery and seizure by the police. *Id.* at 15. Under the circumstances of this case, the apartment occupants had every incentive to intentionally destroy evidence once they knew the police were present outside. Had the

officers stayed outside and called for a warrant, the evidence very likely would have been lost.

¶ 28. *Kiekhefer*, 212 Wis. 2d at 460, and *State v. Wilson*, 229 Wis. 2d 256, 600 N.W.2d 14 (Ct. App. 1999) are also distinguishable. In *Kiekhefer*, as in *Johnson*, the police detected the odor of marijuana while they were standing outside the defendant's closed bedroom door; the defendant was in his room apparently unaware of their presence until they entered without a warrant. The officers entered the room based upon the odor alone, in the absence of any other facts suggesting exigency, and the court of appeals found this insufficient to justify the warrantless entry and search.[7]

---

[7] The court of appeals in *Kiekhefer* emphasized that the police had the situation "well in hand" at the time they detected the marijuana odor, that there was "no indication that Kiekhefer was aware of their presence," and that they "were not confronted with the sounds of destruction emanating from within Kiekhefer's room so as to excuse the warrantless entry." *Kiekhefer*, 212 Wis. 2d 460, 477–79, 569 N.W.2d 316 (Ct. App. 1997). This differs significantly from this case. Here, the presence of the police was unexpectedly revealed to the people in the apartment when Veronica Hughes opened the door; that she rapidly tried to shut it again when she saw them standing there in full uniform was reasonably interpreted by the officers as representing a consciousness of the illegal activity going on inside and a concomitant desire to avoid its discovery by the police.

It is also important to note that this is not a situation in which the exigency was created by the police themselves, which would generally not justify a warrantless search of a home. *See Kiekhefer*, 212 Wis. 2d at 476. The police were lawfully in the hallway waiting for backup before investigating a trespass complaint. They did not detect the marijuana odor until Veronica Hughes unexpectedly opened the door. They were faced with the choice of remaining outside and calling for a warrant based

¶ 29. *Wilson* presents a different situation entirely. In *Wilson*, a police officer went to the defendant's home looking for a juvenile for whom he had an arrest warrant. *Wilson*, 229 Wis. 2d at 260. The officer walked around to the backyard of the home, where he encountered one of the defendant's children. He followed the child to the back door of the house and entered the doorway, at which point he observed smoke and smelled the odor of marijuana coming from the basement. *Id.* at 260–61. The court of appeals found a Fourth Amendment violation based upon its conclusion that the officer was unlawfully inside the curtilage of Wilson's home when he smelled the marijuana; in other words, he should not have been in a position to smell the marijuana in the first place. *Id.* at 266. In this case, however, the officers were entitled to be in the public hallway outside Hughes' apartment and to approach her door in order to investigate the trespass complaint.

¶ 30. Hughes also argues that pursuant to the rationale in the United States Supreme Court's decision in *Welsh v. Wisconsin*, 466 U.S. 740 (1984), the crime of possession of marijuana is not serious enough to justify a warrantless entry under these circumstances. We disagree. In *Welsh*, the defendant drove his car off the road, left the scene and walked home. *Id.* at 742. The police, having determined the defendant's identity, and suspecting that he was intoxicated, entered his home without a warrant and placed the defendant under arrest. *Id.* at 742–43. The state attempted to justify the entry based upon, among other

upon the odor of the drug, or immediately entering to prevent the evidence destruction that would likely have begun as soon as she closed the door. Not having created the exigency themselves, the latter choice was reasonable.

things, the exigency of destruction of evidence: by the time they could obtain a warrant, Welsh's body would metabolize the alcohol, and thus destroy the evidence of his intoxication. The defendant argued that no exigent circumstances justified the entry into his home. The U.S. Supreme Court agreed with the defendant, holding:

> When the government's interest is only to arrest for a minor offense, [the presumption of unreasonableness of warrantless home entries] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.

*Id.* at 750. The *Welsh* court held that the gravity of the offense is an important factor to consider in determining whether exigent circumstances will justify a warrantless entry of a home. *Id.* The court did *not* definitively say, however, that certain categories of offenses are *per se* insufficiently grave to justify a warrantless entry, only that the minor, noncriminal, nonjailable traffic violation in that case (first offense drunk driving) was so.[8] *Welsh* essentially holds that the less significant the offense, the more significant the

---

[8] At the time of *Welsh*, first-offense operating under the influence of an intoxicant was punishable by a non-criminal civil forfeiture not to exceed $200. Wis. Stat. § 346.65(2) (1977–78). A second or subsequent offense within five years became a misdemeanor and carried a fine of no more than $500 and imprisonment of not less than five days nor more than one year. The Court refrained from drawing a bright-line rule: "Because we conclude that, in the circumstances presented by this case, there were no exigent circumstances sufficient to justify a warrantless home entry, we have no occasion to consider whether the Fourth Amendment may impose an absolute ban

exigent circumstances must be in order to justify a warrantless home entry under the Fourth Amendment.

¶ 31. The *Welsh* court suggested in a footnote that the penalty which a state attaches to a particular offense provides "the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." *Id.* at 754 n.14. This footnote provides *Welsh*'s only guidance on how to determine the seriousness of an offense for purposes of evaluating whether exigent circumstances justify a warrantless entry of a home for arrest or search. The State advocates adopting the approach used by the Supreme Court in *Blanton v. City of North Las Vegas*, 489 U.S. 538 (1989), which dealt with determining whether an offense is petty or serious for purposes of the Sixth Amendment right to a jury trial. As in *Welsh*, *Blanton* looked to the legislature as the best judge of the seriousness of a particular offense. *Id.* at 541.

¶ 32. *Blanton* held that the seriousness of an offense for Sixth Amendment purposes should be objectively determined by looking to the maximum penalties fixed by the legislature. *Id.* The primary focus is on the maximum potential incarceration (under *Blanton*, an offense with a six-month maximum is presumed to be petty); however, other statutory penalties are also relevant. *Id.* at 542–43.

¶ 33. This approach to the analysis has its limitations when applied in this context. We are not engaged in a static evaluation of the seriousness of a single, particular, charged offense for Sixth Amendment right to jury trial purposes. Rather, we are engaged in a broader evaluation of the seriousness of a number of

on warrantless home arrests for certain minor offenses." *Welsh*, 466 U.S. at 750 n.11.

potentially chargeable offenses, balanced against a certain sort of exigency (here the likely intentional destruction of evidence) for purposes of determining the legality of a warrantless entry and search under the Fourth Amendment, for which the touchstone is always reasonableness.

¶ 34. Hughes suggests that we look only to the punishment for first-offense possession of marijuana to determine the seriousness of the crime at issue in this search. But this approach is too narrow, and ignores both the facts of this case which established the probable cause in the first place, and the legislature's election to punish drug offenses on a graduated basis, depending upon the defendant's status as a mere possessor or presumptive dealer as well as his or her status as a first time offender or a repeater. It also ignores the practical realities facing officers in the field under circumstances such as those presented here. Particularly in the drug context, officers are called upon to make rapid decisions balancing the risk of intentional evidence destruction against the seriousness of what may be a variety of potentially chargeable offenses.

¶ 35. At the time of the entry in this case, the police did not know with certainty whether they were dealing with mere first offense possessors of small amounts of marijuana, or repeat offenders, or those who possessed larger amounts from which intent to deliver could be inferred. What they did know, however, was that they were investigating a trespass by persons who were known to be involved with illegal drugs in a building known for its heavy drug activity, and that a strong odor of marijuana was present, establishing probable cause that some quantity of the drug was present. They also knew that once the people

298

inside the apartment were alerted to their presence, the likelihood of intentional evidence destruction was extremely high.

¶ 36. We conclude that, under the circumstances of this case, the determination of the seriousness of the offense for purposes of Fourth Amendment exigent circumstances analysis requires an evaluation of the overall penalty structure for offenses of this type. The legislature's view of the seriousness of marijuana-related offenses is reflected not only in the penalty it has established for first offense possession of a small quantity of the drug, but also the penalty it has established for repeat offenders, and those who possess larger amounts giving rise to the inference that they possessed the drug with intent to deliver.

¶ 37. First-time possession of marijuana is a misdemeanor, punishable by up to six months incarceration. Wis. Stat. § 961.41(3g)(e). A second or subsequent offense is a felony, punishable by up to one year in state prison. Wis. Stat. § 961.48(2). An offender is also subject to a fine of $1000 for a first offense or $2000 for a second or subsequent offense. Wis. Stat. § 961.48(2). In addition, even for first-time offenders, Wisconsin law provides for mandatory suspension of operating privileges for a maximum of five years. Wis. Stat. § 961.50.

¶ 38. The legislature has also established a graduated scale of penalties which raises the maximum penalties as the quantity of the drug increases and intent to deliver is present. At the time of Hughes' arrest,[9] first-offense possession of marijuana with intent to deliver 500 grams or less or ten or fewer plants carried a fine of $500 to $25,000 and the poten-

---

[9] Effective December 31, 1999, Wis. Stat. § 961.41(1m)(h) has been amended to provide longer maximum sentences.

tial of imprisonment for up to three years. Wis. Stat. § 961.41(1m)(h)1. These penalties increased to a fine of up to $50,000 and imprisonment for three months to five years for 500 to 2500 grams of marijuana or 10 to 50 plants. Wis. Stat. § 961.41(1m)(h)2. For possession with intent to deliver any quantity over 2500 grams or 50 plants, an offender faced a fine of $1000 to $100,000 and imprisonment for up to ten years. Wis. Stat. § 961.41(1m)(h)3. Repeat offender penalty enhancers also apply to possession with intent to deliver. For a second or subsequent offense, the maximum potential term of incarceration doubles. Wis. Stat. § 961.48(2).

¶ 39. Possession of marijuana, therefore, even a first offense and a small amount, is treated significantly more seriously than the noncriminal, nonjailable first offense drunk driving violation involved in *Welsh*, subjecting an offender to a range of penalties, including incarceration, fines and loss of driving privileges.[10] Furthermore, the nature of the exigency in this case (the intentional destruction of evidence) is far more immediate and compelling than that involved in *Welsh* (the slow metabolization of alcohol). Therefore, taking the overall penalty structure for marijuana possession into consideration, and evaluating it against the backdrop of the very real and serious

---

[10] The complaint in this case also contained the allegation that the offense took place within 1000 feet of a school, requiring the court to impose 100 hours of community service, in addition to any other penalties, for first-offense simple possession. Wis. Stat. § 961.495. For first-offense possession with intent to deliver, this enhancer potentially adds up to five years incarceration to a sentence. Wis. Stat. § 961.49(1)(b)6.

exigency present here, we conclude that *Welsh* does not require invalidation of this warrantless home entry.[11]

¶ 40. Having established that the entry was justified, we now turn to the second issue raised by the parties: whether Hughes' consent to the personal search was voluntary and not the result of police coercion. The trial court found that Hughes' consent was voluntary. The court of appeals disagreed, finding that Hughes' consent was not sufficiently attenuated from an entry that the court had determined was unlawful. We have found the entry in this case to be lawful, and so the attenuation analysis need not be undertaken. We further find, based upon Hughes' words and actions, that her consent was otherwise voluntary and not coerced.

¶ 41. The question of whether a defendant voluntarily consented to a search is determined independently by applying the appropriate constitutional principles to the facts as found by the trial court. *State v. Phillips*, 218 Wis. 2d 180, 194–95, 577 N.W.2d 794 (1998). The test for voluntariness is whether consent to search was given in the "absence of actual coercive improper police practices designed to overcome the resistance of a defendant." *State v. Clappes*, 136 Wis. 2d 222, 245, 401 N.W.2d 759 (1987). In making this determination, no single factor is dispositive.

---

[11] The State makes an alternative argument in defense of this entry: that the police may enter a residence without a warrant to arrest for a misdemeanor when they have probable cause to believe that the crime is being committed in their presence by persons inside. We have upheld this entry and search based upon the presence of probable cause and exigent circumstances involving the risk of evidence destruction. We do not, therefore, reach the State's alternative argument.

*Phillips*, 218 Wis. 2d at 198. Instead, we examine the totality of the circumstances, with special emphasis placed on the circumstances surrounding the consent and the characteristics of the defendant. *Id.*

¶ 42. The State has the initial burden to show that the defendant's consent was voluntary. *State v. Lee*, 175 Wis. 2d 348, 359, 499 N.W.2d 250 (Ct. App. 1993). Once the State has shown that the defendant gave consent, was willing to give it, and that he or she did not give it as a result of duress, threats, coercion or promises, the burden shifts to the defendant to show that the police used improper means to obtain his or her consent. *State v. Nicholson*, 187 Wis. 2d 688, 696, 523 N.W.2d 573 (Ct. App. 1994).

¶ 43. The State has presented evidence that the defendant not only verbally consented to the search of her person, but also affirmatively assisted the police in performing that search. Officer Kurth, whom the trial court singled out as being "especially credible," testified that Hughes verbally consented to the search. The evidence also established that without any prompting, Hughes lifted her skirt and essentially revealed the drugs concealed in her underwear before Kurth even began the pat-down.

¶ 44. Hughes offers almost no evidence of improper police practices. Hughes' primary argument is that she did not voluntarily consent but "merely acquiesced" to what Kurth stated she was there to do. We are not persuaded. Hughes' behavior suggests that she was not simply going along. She actively cooperated. with the search, lifting her skirt without being directed to do so, perhaps (as suggested by the State) in a calculated effort to take control of the search to prevent the officer from discovering the cocaine she knew

she was hiding on her person. Such behavior goes beyond "mere acquiescence."

¶ 45. Hughes' behavior during the search also contradicts her argument that she was intimidated into acquiescence. By her own testimony, she was initially yelling at the police and actively disobeying the officers' orders. Hughes' boyfriend Michael Webb testified that Hughes was "going off" on the police as they searched the apartment. If Hughes was frightened into submission by a show of authority on the part of police, as she claims to have been, it seems she would have been more likely to sit quietly by than to actively disobey and verbally assault them. Hughes' actions at the time of the search speak louder than her words now. Her behavior contradicts any argument that she felt compelled by the police to consent to the search.

¶ 46. Hughes asserts that her particular characteristics made her vulnerable to coercion. She cites factors regularly considered by courts in determining voluntariness, including her age, education, emotional state, and prior experience with police. However, Hughes, at 20 years old, was not a minor at the time of the search. *See Phillips*, 218 Wis. 2d at 202. She had completed the eleventh grade, and has presented no evidence of below average intelligence or abilities. *See id.* Although Hughes herself had no prior record, she had lived for over a year in a building that was often the subject of drug sweeps by the Milwaukee Police Department. She could not have been completely unfamiliar with the police. We are not persuaded that Hughes was unusually susceptible to coercion.

¶ 47. Hughes also argues that the officers' failure to inform her that she had the right to refuse consent to the search made her particularly vulnerable to involuntary acquiescence in it. Although this factor

generally weighs against a determination of voluntary consent, it is not the only factor in the analysis and does not mandate a finding of involuntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Under the circumstances of this case, this factor is not significant enough to tip the balance against a finding of voluntary consent.

¶ 48. We hold, therefore, that the police officers' entry into Vanessa Hughes' apartment to search for evidence of marijuana possession was supported by probable cause and justified by exigent circumstances. We also find, based upon her words and actions, that Hughes voluntarily consented to the search of her person. Thus, the circuit court properly denied Hughes' motion to suppress, and the decision of the court of appeals is reversed.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 49. ANN WALSH BRADLEY, J. *(dissenting).* In the late afternoon of June 4, 1996, officers purportedly with guns drawn barged into a two-bedroom apartment in the City of Milwaukee because they smelled the odor of marijuana. They could have, but did not, obtain a search warrant. Instead, fearful that the evidence of a first offense possession of marijuana might be destroyed, they made a warrantless entry.

¶ 50. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). In no setting is the "zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of

304

an individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980). Accordingly, warrantless searches and seizures inside a home are "presumptively unreasonable." *Id.* at 586.

¶ 51. The heightened protection afforded by the Fourth Amendment generally requires the issuance of a warrant by a neutral magistrate before the police may enter the thresholds of our residences. This constitutional requirement is not a mere formality. The neutral magistrate decides when our right to privacy must yield to the police need for intrusion. A warrantless entry, as here, negates the role of the neutral magistrate and circumvents constitutional protections.

¶ 52. This court has recognized the limited exceptions to warrantless searches, including exigent circumstances based on the destruction of evidence. *State v. Kiper*, 193 Wis. 2d 69, 89–90, 532 N.W.2d 698 (1995). Unfortunately, the majority's validation of the facts of the present case as exigent circumstances threatens to swallow the rule by relaxing the restraint embodied in the Fourth Amendment. The destruction of marijuana upon which the officers justified their search of Hughes's home does not rise to the level of exigency required to rebut the presumption of the search's unreasonableness.

¶ 53. In *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984), the United States Supreme Court explained that the application of the exigent circumstances exception to the exclusionary rule in the context of home entries should rarely be sanctioned where there is probable cause to believe that only a minor offense has occurred. The majority's attempt to distinguish and dismantle the precedential importance of *Welsh* is unconvincing.

¶ 54. In its attempt to distinguish *Welsh*, the majority first acknowledges that *Welsh* does not stand for the proposition that certain types of offenses are *per se* minor so as to invalidate a warrantless entry, but rather stands for the rule that the minor offense at issue in that case did not justify the search. Majority Op. at ¶ 30. Then, the majority observes that the *Welsh* Court offered scant guidance on defining the precise meaning of a minor offense and only mentioned in a footnote that the penalty attaching to a particular offense provided the best indication of the gravity of that offense. Majority Op. at ¶ 31.

¶ 55. This observation ignores the ample discussion in *Welsh* on the method of determining the gravity of an offense. In addition to the footnote to which the majority points, the Court in *Welsh* refers to *Payton* and its recognition of the importance of a felony limitation on warrantless intrusions into the home. *Welsh*, 466 U.S. at 750 n.12.

¶ 56. The *Welsh* Court further amplifies the definition of "minor offense" by quoting with approval from Justice Jackson's concurrence in *McDonald v. United States*, 335 U.S. 451, 459–60 (1948):

> Whether there is a reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it. . . . It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up **offenses that involve no violence or threats of it.** . . .When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to

> some real immediate and serious consequences if he postponed action to get a warrant.

(Emphasis added.)

¶ 57. *Welsh* also restricts focus on the first-time commission of a particular offense absent knowledge that the suspect is a repeat offender subject to enhanced penalties. 466 U.S. at 746 n.6, 754. Consistent with *Welsh*, other courts have also evaluated exigency by focusing on first offense or simple marijuana possession when probable cause of aggravating circumstances has not been present. *See e.g., State v. Holland*, 2000 WL 92231, *6 (N.J. Super. App. Div. Jan. 26, 2000); *State v. Wagoner*, 966 P.2d 176, 182 (N.M. Ct. App. 1998). Contrary to the majority's conclusion, the United States Supreme Court in *Welsh* provides sufficient direction in determining what constitutes a minor offense.

¶ 58. In the present case, it is undisputed that the officers only had probable cause to believe that the occupants of Hughes's apartment were committing a first offense of marijuana possession, the State having conceded that point during oral argument. The crime for which probable cause existed to obtain a search warrant, the first offense of marijuana possession, is neither a felony nor a crime involving violence or threats of it. Pursuant to the *Welsh* analysis, the offense is "relatively minor."

¶ 59. The majority sidesteps the breadth of discussion in the Fourth Amendment case of *Welsh* and instead resorts to a Sixth Amendment case, *Blanton v. City of North Las Vegas*, 489 U.S. 538 (1989), for instruction on determining the gravity of marijuana possession in the Fourth Amendment context. In *Blanton*, the Court noted that although the penalty for an offense may include a fine and probation, primary

emphasis in the determination of the gravity of the offense should be placed on the maximum potential incarceration. *Id.* at 542. That is because a fine or probation "cannot approximate in severity the loss of liberty that a prison term entails." *Id.* Indeed, the *Blanton* Court concluded that a $1,000 fine and the revocation of driving privileges, in addition to six months incarceration, did not transform the "petty" offense of driving under the influence of alcohol into a serious one. *Id.* at 544–45.

¶ 60. Having invoked *Blanton*, the majority nevertheless dismisses the case because of its focus on a particular single offense. The majority states that it wishes to embark instead upon "a broader evaluation of the seriousness of a number of potentially chargeable offenses. . . ." Majority Op. at ¶ 33. The majority cites no authority for its leap into the examination of the entire penalty scheme for a host of marijuana-related offenses.

¶ 61. This unwarranted leap represents the majority's effort to dismantle the precedential importance of *Welsh*. Its attempt to depict the gravity of first-time marijuana possession in an opaque light by examining penalties for other marijuana offenses directly contravenes the *Welsh* mandate that the focus be on a first offense absent knowledge of aggravating circumstances. Furthermore, the evaluation of a range of offenses completely ignores the State's concession that the officers in this case only had probable cause to believe that a first offense was being committed.

¶ 62. The majority's criticism of Hughes's myopic focus on the first offense fails to recognize that it is precisely this myopic view that the United States Supreme Court in *Welsh* contemplates when officers do not have probable cause to suspect other offenses. 466

U.S. at 746 n.6, 754. The attempt to deflect attention from the first offense of marijuana possession by an elaborate recitation of potential penalties for other marijuana offenses and potential penalty enhancers evades controlling precedent.

¶ 63. The simple truth is that first-time possession of marijuana carries a maximum period of incarceration of six months. Wis. Stat. § 961.41(3g)(e). The parties concede that generally it can be charged either as a criminal misdemeanor or as a civil forfeiture. For first-time offenders, a court may even conditionally discharge and place the defendant on probation without any adjudication of guilt. Wis. Stat. § 961.47(1).

¶ 64. Indeed, shortly after the events transpired in this case, the City of Milwaukee enacted an ordinance decriminalizing the possession of 25 grams or less of marijuana. *See* Milwaukee Code of Ordinances, 106–38 (1997). This 1997 ordinance provides for a civil forfeiture as penalty and appears consistent with the penalty for possession of small quantities of marijuana in the suburbs of Milwaukee and other Wisconsin cities.[1]

¶ 65. Before the court of appeals, the State even made a concession that first offense marijuana possession is a minor offense. After citing to *Welsh* in its initial brief to the court, the State then noted that it "concedes that the offense apparent to the police in this case, possession of marijuana, is 'minor' since the maximum penalty is only six months in jail. Wis. Stat. § 961.41(3g)(e) (1995–1996)." The State's subsequent

---

[1] *See e.g.*, Glendale City Ord. § 11–2–11; Greenfield City Ord. § 10.161.41(3); Madison City Ord. § 23.20(6); Menomonee Falls City Ord. § 1031(q); Waukesha City Ord. § 11.01(5); West Allis City Ord. § 6.02(3).

endeavor to temper this concession by claiming that it was made in the context of a separate argument is unpersuasive.

¶ 66. Allowing law enforcement officers to gauge the severity of an offense by considering the entire penalty scheme for a range of related offenses sets a dangerous precedent. Any offense that is included in a scheme of graduated penalties would thereby be rendered serious. This rationale would even include the first offense of driving while intoxicated (DWI) at issue in *Welsh*, because a subsequent DWI would impose stricter penalties and a potential incarceration period of one year. 466 U.S. at 746.

¶ 67. The *Welsh* Court, however, explicitly rejected a focus on heightened penalties and repeat offenses without knowledge of the defendant's prior arrests or convictions. Indeed it is rather ironic that the defendant in *Welsh* was actually a repeat offender and yet the Court specifically required police to presume a first offense without further knowledge of his repeater status. However, in this case, Hughes had no prior criminal history and yet the majority sanctions the presumption of repeater status as well as an intent to deliver marijuana. This the majority cannot do.

¶ 68. Several courts have faithfully adhered to the *Welsh* limitations on warrantless entries into the home. *See e.g., Holland*, 2000 WL 92231 at *6-*7; *Wagoner*, 966 P.2d at 182; *State v. Ramirez*, 746 P.2d 344, 347 (Wash. Ct. App. 1987); *State v. Curl*, 869 P.2d 224, 226–27 (Idaho 1993). These courts have not encountered difficulty in applying *Welsh* to invalidate warrantless searches based on the destruction of evidence of first offense or simple marijuana possession. Furthermore, they have done so without resort to an

examination of the entire penalty scheme for marijuana possession or the intent to deliver marijuana.

¶ 69. In recognizing the first offense of drunk driving at issue in *Welsh* as "relatively minor," the United States Supreme Court was addressing the legal, not societal, consequences of the offense. Likewise, recognizing first offense marijuana possession as minor addresses the legal status of that offense.

¶ 70. Both drunk driving and illegal drug use represent blights on our communities. Yet, the United States Supreme Court has refrained from allowing moral judgments to obscure the legal reality that in the battle against drunk driving, some violations lie on the lower end of the spectrum of gravity. The same is true for the war on drugs. The Court has mandated that only exigent circumstances in serious offenses excuse a warrantless entry in the home.

¶ 71. Consistent with the United States Supreme Court directive, the majority should be unwilling to sacrifice the sanctity of the home and be wary of so easily diluting our constitutionally guaranteed freedom from warrantless entry. Today's decision relaxes without justification the protections of the Fourth Amendment and allows exigent circumstances to be the rule rather than the exception. Because the majority casts aside controlling precedent and upholds a constitutionally infirm search, I dissent.

¶ 72. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE WILLIAM A. BABLITCH join this dissenting opinion.