COURT OF APPEALS
DECISION
DATED AND FILED

June 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP2316-CR**

Cir. Ct. No. **2022CF401**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

MARIE L. HANSON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Winnebago County: MICHAEL S. GIBBS, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Marie L. Hanson appeals from her judgment of conviction for possession with intent to deliver methamphetamine entered on her no contest plea. She claims the circuit court erred when it denied her motion to suppress evidence derived from a traffic stop and subsequent search of the vehicle in which she was a passenger. For the following reasons, we affirm.

## Background

¶2    On June 26, 2022, a City of Menasha police officer performed a traffic stop that ultimately led to the arrest of Hanson and charges for possession with intent to deliver methamphetamine and felony bail jumping. She moved to suppress evidence from the stop, and an evidentiary hearing on that motion produced the following evidence.

¶3    The officer testified that he performed a traffic stop on a vehicle based on information indicating the registered owner did not have a valid driver's license. The officer made contact at the passenger side of the vehicle, where Hanson was seated. When Hanson checked the glove box for proof of insurance, the officer observed "[m]ultiple torch lighters," which are typically used for the "[l]ighting of various narcotic products." He further indicated that such lighters are not often used to light cigarettes because of "the torch aspect of it, the little tubing of the flame."

¶4    With no proof of insurance located in the glove box, Hanson and the driver indicated they would try to call the registered owner to see if they could get a copy of such proof. While they did this, the officer returned to his squad car, ran their background information, and learned both Hanson and the driver "had past drug history or current open cases." Specific to Hanson, she had "a current open case through Outagamie County for drugs," with the officer testifying to being "fairly certain" it was for a felony-level offense. The officer also learned Hanson

2

had a warrant for her out of the State of Georgia for narcotics use with a specific warning regarding "dangerous drugs." Aware of Hanson's drug-related record and "actually seeing something that I know is directly associated oftentimes with narcotics," the officer called for a K9 unit to come to the scene.

¶5      Returning to Hanson and the driver, the officer spoke on the phone to the registered owner of the vehicle, who advised he did not have insurance on it. When asked if it was "okay" that the driver and Hanson had his vehicle, the owner hesitated and simply responded, "I guess." The officer testified that "[i]t sound[ed] like he d[idn't] even know they ha[d] the car." The officer observed that Hanson "was noticeably shaking, and her knee was going up and down, and [she was] biting at her fingernails. Again, both those are common signs of nervousness." The driver was smoking a cigarette "somewhat fast," which the officer stated also oftentimes indicates nervousness. The officer added that there was "no reason for an insurance situation [to cause them to] be that nervous."

¶6      On cross-examination, the officer acknowledged that his original basis for stopping the vehicle—his belief the driver might not have a valid license— was cleared up as soon as the officer learned that the driver was not the (unlicensed) registered owner of the vehicle. The officer stated that once he learned they did have permission to drive the vehicle, but there was no insurance on it, he then needed to complete the paperwork for the insurance violation. He indicated it normally takes "five-ish minutes" to fill out the citation, but that he also "review[s] it, make[s] sure it's accurate as far as some of the data," and he then prints it out. He testified that the torch lighters he observed in the glove box were not illegal to possess, "so I guess you can have one to use for, I guess, whichever event you want to."

¶7      The K9 officer who responded to the traffic stop involving Hanson testified next.  He stated his K9, Athos, is "trained in narcotics detection.  Those detections would be cocaine, MDMA, methamphetamines, or other narcotics."  The circuit court admitted into evidence training certificates for the K9 officer and Athos.  The K9 officer described some of the training he and Athos had completed as well as various types of "alerts" Athos will give to show he has identified a narcotic odor, including his body becoming rigid, his ears tucking back, and his breathing increasing.  The K9 officer agreed that different K9s alert differently.  Addressing Athos' "record" on sniffs, the K9 officer stated Athos has approximately a 97 percent record of correctly alerting to drugs that are or have been present in a vehicle, with those alerts subsequently "substantiated by some other means."

¶8      When the K9 officer and Athos arrived at the scene, the officer had Athos perform a sniff of the vehicle.  The window of the passenger side door was open to some extent, and Athos

> kind of jumped up, which is already an alert for me when he wants to get up and get into this vehicle.  Then his body was [rigid], his ears tucked back, and his breathing increased; and then if I recall, he started sniffing down the door seam, and then he went down and started—I think he—I can't remember which direction he continued to sniff.
>
> At that point, he's trying to get to the source of this trained odor that we're on.  In my opinion, that was an alert.  From what I've seen in all the training that we've done, that was definitely an alert for K9 Athos.

¶9      On cross-examination, the K9 officer indicated that he "used Athos in the field" 44 times in 2022, which included "quite a few traffic stops," as well as building searches and tracking.  The K9 officer's body camera video was played, during which the officer described the alert by Athos: "[H]e jumps up into the window, and he's increasing his breathing, it's almost exactly what I look for every

time.… [T]hat is an alert in this case." Discussing the video, the K9 officer further stated,

> So once he gets up there [on the window], his tail was kind of wagging, and then it will slow down. His breathing increased and his body is [rigid].
>
> …The fact that he's not willing to leave that right away … [is] telling me that there's something or had been something in that vehicle that he's trained on.

The officer further explained that "[i]t's just a combination of everything that he's doing and the totality of the circumstances, what he's doing is showing that he's alerting on the car."

¶10    Hanson argued to the circuit court that evidence flowing from the search should be suppressed primarily due to a lack of reasonable suspicion to extend the traffic stop for the K9 sniff but also due to a lack of probable cause to search the vehicle. The court disagreed with Hanson as to both reasonable suspicion and probable cause and denied her suppression motion. Hanson eventually pled no contest to the charge of possession with intent to deliver methamphetamine, and the bail-jumping charge was dismissed but read in. The court withheld sentence and placed Hanson on probation for three years. Hanson appeals.

### *Discussion*

¶11    Hanson contends the circuit court erred in determining the traffic stop was lawfully extended, based upon reasonable suspicion of a criminal violation, to allow for the dog sniff and in determining the search of the vehicle was lawful, based upon probable cause. We conclude the court did not err.

¶12    Reviewing a circuit court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the court's factual findings. *State v. Smiter*, 2011 WI App 15, ¶9, 331 Wis. 2d 431, 793 N.W.2d 920 (2010). Our review of whether the facts constitute reasonable suspicion or probable cause, however, is de novo. *State v. Powers*, 2004 WI App 143, ¶6, 275 Wis. 2d 456, 685 N.W.2d 869; *State v. Moore*, 2023 WI 50, ¶8, 408 Wis. 2d 16, 991 N.W.2d 412.

*Reasonable Suspicion*

¶13    Hanson acknowledges that the officer's extension of the traffic stop beyond the time needed to write a citation to the driver for operating the vehicle without insurance would be lawful "if it [was] supported by reasonable suspicion," but she claims the officer lacked such suspicion. We disagree.

¶14    "Reasonable suspicion is 'a low bar.'" *State v. Nimmer*, 2022 WI 47, ¶25, 402 Wis. 2d 416, 975 N.W.2d 598 (citation omitted). In determining whether reasonable suspicion exists, we must consider what a reasonable police officer would have reasonably suspected given his or her training and experience. *State v. Waldner*, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). Taking "everything observed by and known to the officer[]," we "determine whether the officer[] had 'a particularized and objective basis' to reasonably suspect [the defendant] of criminal activity." *Nimmer*, 402 Wis. 2d 416, ¶26 (citations omitted). We look at

the totality of the facts taken together. *Waldner*, 206 Wis. 2d at 58. As facts accumulate, reasonable inferences about their cumulative effect can be drawn. *Id.*

¶15 A traffic stop may be lawfully extended "and a new investigation begun" if an officer already involved in a lawful investigation "becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's intervention in the first place." *State v. Betow*, 226 Wis. 2d 90, 94-95, 593 N.W.2d 499 (Ct. App. 1999). The officer initiating the traffic stop in the case now before us became aware of such additional suspicious factors.

¶16 At the time the officer extended the stop longer than necessary to write a citation for an insurance violation, he was aware that: (1) there were "[m]ultiple torch lighters" in the glove box directly in front of Hanson and that such lighters are not often used to light cigarettes but are typically used for the "[l]ighting of various narcotic products"; (2) Hanson had "a current open case through Outagamie County for drugs" as well as a warrant out of Georgia for narcotics use, with a specific warning regarding "dangerous drugs"; (3) both Hanson and the driver, who also had a "past drug history or current open cases," were exhibiting noticeable physical signs of nervousness—beyond the sort of nervousness one would expect for only an "insurance situation"; and (4) Hanson and the driver's permission to use the vehicle was weak. Even without this last point, the officer easily had "a particularized and objective basis" to reasonably suspect drugs may be present and extend the stop for a sniff by the K9 unit. *See Nimmer*, 402 Wis. 2d 416, ¶26 (citation omitted).

7

*Probable Cause*

¶17    Once the K9 alerted to the presence of drugs in the vehicle, the officers searched it and located drug-related evidence that led to Hanson's arrest and the subsequent charges in this case. Hanson contends the officers lacked probable cause to search the vehicle and that the circuit court erred in concluding otherwise. We disagree.

¶18    "The quantum of evidence required to establish probable cause to search is a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *State v. Hughes*, 2000 WI 24, ¶21, 233 Wis. 2d 280, 607 N.W.2d 621 (citation omitted). Added to the evidence of "[m]ultiple torch lighters" and their connection to drug use, Hanson's notable and current record related to illegal drugs, and her, as well as the driver's, excessive nervousness was the alert by the trained drug dog—a "signal," as the circuit court called it in its ruling—indicating drugs were likely in the vehicle. Hanson's drug record indicated she had a significant and recent problem with illegal drugs, the torch lighters suggested other items related to illegal drug use may also be present in the vehicle, and the excessive nervousness of both the driver and Hanson indicated consciousness of guilt—their awareness that the vehicle contained illegal drug evidence and this officer might find it. The alert by Athos easily pushed the totality of the evidence over the threshold of a fair probability that evidence of a drug crime would be found in the vehicle. Thus, the search was supported by probable cause.

    *By the Court.*—Judgment affirmed.

    This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2023-24)