IN the MATTER OF the ESTATE OF Julia DEJMAL, De-
ceased: Anastasia JOHNSON, Isabell Hauth, Annie
Janisch, Mary Jenkins, Carl Kordosky and Joe Kor-
dosky, Jr., Appellants,

v.

Ed MERTA and Alica Merta, his wife, co-personal repre-
sentatives of the Estate of Julia Dejmal, Respon-
dents.

Supreme Court

*No. 77–449. Submitted on briefs March 5, 1980.—
Decided April 1, 1980.*
(Also reported in 289 N.W.2d 813.)

142

For the appellants the cause was submitted on the brief of *C. M. Bye* and *Gaylord, Bye & Rodli, S.C.*, of River Falls.

For the respondents the cause was submitted on the brief of *James A. Drill* and *Doar, Drill, Norman, Bakke, Bell & Skow* of New Richmond.

BEILFUSS, C.J.   This is an appeal from an order of the county court of Pierce county dated November 11, 1977, admitting the will of Julia Dejmal to probate.

The appellants here, the objectors to the admission of the will, have raised several issues dealing with formal legal requirements for the execution of the will, the competency of the testatrix, undue influence and the sufficiency of the evidence. We have reviewed these issues and conclude the order admitting the will to probate must be affirmed.

Julia Dejmal died on November 24, 1973, at the age of eighty-one. She was preceded in death by her husband in 1956 and her only son, a bachelor without issue, on September 25, 1968. She died testate pursuant to a "Last

Will and Testament" dated December 13, 1968. The will bequeathed all of her property valued at $70,460.94, to a niece and her husband, respondents Alice and Ed Merta.

On December 8, 1973, Alice Merta petitioned the county court of Pierce county for probate of the will. A brother, sister, two nieces and one nephew of the deceased, appellants herein, filed objections to the will, alleging:

"1. That at the time of the execution of said instrument, the said JULIA DEJMAL was not of sound mind and did not have sufficient mental capacity to make a Will.
"2. That the execution of said instrument was procured by undue influence exercised over and upon the said JULIA DEJMAL, Deceased."

Added to these grounds in a subsequent notice of will contest filed by respondents were the allegations that the will was not duly executed and execution was procured by fraud.

A hearing on the objections was held and the following facts were testified to at the hearing:

Julia Dejmal lived on a forty-acre farm about seven miles outside of the City of River Falls. The house in which she lived had no running water, electricity or telephone. Cooking was done on a wood stove which, together with a Jungers oil heater, provided heat for the premises.

Julia had lived on the farm with her husband, Frank, and their son, William. In addition to the farm, the family ran a kind of "junk" business. They collected and sold paper, rags and scrap metal. Following the death of her husband in 1956, Julia was cared for generally by her son until his death in September of 1968. After that time she remained on the farm by herself.

A niece Alice Merta and her husband lived three to four miles from the Dejmal farm and, prior to William's

death, visited Julia and her son several times a month. Occasionally, when Julia or her son was ill, Alice brought them food, but normally Julia did her own cooking.

After William's death, Alice began to visit Julia on almost a daily basis. She and her husband assisted Julia in household chores such as carrying wood and water into the house, shoveling snow and making minor household repairs. They also helped her tie up the loose ends of the family's "junk" business and settle the estate of her son. Julia did not drive and relied upon the Mertas for transportation to and from town. They occasionally took her to church and to the grocery store. On several occasions Alice Merta drove and accompanied Julia to her attorney's office for discussions on tax matters and the probate of her son's estate.

One day, as Alice and Julia were returning from the court proceedings for the probate of her son's estate (she was appointed by the court as personal representative), Julia remarked on how simple probate could be when there was a will. Neither her husband, nor her son, had died testate, but on that day, as she was waiting for the proceedings for the estate of her son to be called, she had occasion to observe the probate of an estate disposed of by will. Some time later Julia told Alice that when she died it would be different than when her husband and son died. She then asked Alice to write down her instructions for the disposition of her estate.

Julia Dejmal suffered from an arthritic condition which made writing very difficult for her, and it was for this reason that she asked Alice to take down her instructions. After Alice wrote out by hand what Julia had dictated, Julia signed and kept it.

This document is as follows:

"Written on December 9, 1968, at River Falls, Wisconsin.

"These are my wishes and last will. After my death Ed and/or Alice Merta are to pay up all remaining Bills,

make funeral arrangement in the manner I have instructed them too. Also have engraving put on gravestone. For this and all the other care and services already given to me they are to get the entire remaining estates, Personal property, Real Estate and Savings.

"Signed Dec. 9, 1968
"/s/ Julia Dejmal"

Not until several days later when Julia entered the hospital for treatment of lung congestion did Alice Merta again see this paper. Alice had driven Julia to her doctor's office after she had developed a cough. Upon examining her, the doctor suggested that she be hospitalized for six or seven days. As Alice was driving her to the hospital, Julia gave her the paper which she had dictated earlier and instructed her to take it to Ralph Senn, her attorney, to see if it was a valid will. If it was not, Attorney Senn was to make it so. Julia also told Alice to have Senn include certain instructions for her funeral and for religious services to be held for her and her family following her death.

After driving Julia to the hospital, Alice Merta went to Senn's office, handed him the paper Julia had signed and repeated her instructions. Senn informed Alice that it would have to be typed with the additional instructions, and properly signed and witnessed in order for it to be valid. He stated that he would draft the document but would be unable to go to the hospital to have Julia execute it because he had the flu. He instructed Alice that Julia would have to sign the will in the presence of two witnesses and then the witnesses had to sign it in the presence of Julia and each other. Attorney Senn suggested that if the will was executed at the hospital it would be best if one of the witnesses were a doctor or nurse.

One or two days later Alice returned to Attorney Senn's office and picked up the newly drafted will. Senn again instructed her as to how the will was to be exe-

cuted. He emphasized to her that she herself could not serve as a witness.

Attorney Senn's secretary, Daphne Thompson, typed up and placed in the file containing a copy of the will a short memo which read:

### "MEMO"

"Mrs. Julia Dejmal was hospitalized at River Falls (St. Joseph Hosp.) at the time this Will was drawn. It was drawn per instructions from Mrs. Ed. Merta—who came in presumably with directions from Julia. Neither Ralph E. Senn or D. Thompson ever heard Julia express any ideas about her will, or had any discussions with her about it.

"Mrs. Merta took original Will away—we typed up three copies and kept one for our file. Presumably she took it to Julia in the hospital. We do not know if it was executed or not, or who the witnesses are (perhaps hospital personnel)"

After she picked up the will, Alice Merta contacted her sister-in-law and niece, Lucille and Catherine Pechacek, and asked them if they would be willing to come to the hospital and witness Julia's signing of it. They agreed to do so and met Alice at the hospital at about 6:30 on the evening of December 13, 1968.

The three women met in the hall outside Julia's room. Alice entered first and found Julia standing by the window dressed in a house gown. She then sat down on the bed and Alice placed the will on the table before her. Alice explained to Julia that Attorney Senn had retyped the will as she had instructed. Julia asked if it said what she had dictated to Alice earlier and Alice replied that it did.

Lucille and Catherine Pechacek then entered the room and observed Julia sign the will at the place where Alice indicated. No statement regarding the will was made while they were present other than Alice's instructions as to where it was to be signed. After Julia signed,

Lucille and Catherine signed as witnesses and then left. Julia then retained the will and placed it in her purse.

Julia Dejmal was released from the hospital a short time thereafter. She continued to conduct her personal and business affairs as she had before. Attorney Senn met with her on several occasions regarding the closing of her son's estate and regularly regarding her income tax returns until she died some five years later. On one of these occasions, after he had learned who had witnessed the will and that no doctor or nurse had been present, Attorney Senn asked Julia if the will was satisfactory and she replied that it was fine and she did not want it redone.

Appellant-objectors disputed the testimony of Alice Merta and Lucille Pechacek that Julia's signing had been properly witnessed at the hospital. At the hearing they called as a witness Francis J. Johnson, a former boyfriend of Catherine Pechacek, who testified that sometime during the Christmas holiday season of 1973 Catherine Pechacek had expressed concern to him about witnessing the signing of Julia Dejmal's will. Johnson testified that Catherine told him she had signed the will as a witness at the home of her parents and Julia Dejmal was not present at that time.

Catherine Pechacek did not testify at the hearing on the will. At that time she was no longer a resident of Wisconsin. Although the record indicates that she was deposed on two separate occasions, neither deposition was made a part of the record. During cross-examination of Francis Johnson, counsel for respondents referred to the depositions and indicated that on both occasions Catherine Pechacek had testified that she had signed Julia Dejmal's will as a witness at the hospital after observing Julia herself sign it. And Johnson admitted on cross-examination that he had been informed by counsel for appellants that there was a conflict be-

tween his testimony and that of Catherine Pechacek regarding what she had told him. Other than these references, however, there is no indication as to what Catherine Pechacek said at her depositions.

On November 11, 1976, the trial court entered its order admitting the will. It filed a memorandum opinion in support of its order in which it concluded that the will was properly executed and that Alice Merta did not exert undue influence upon Julia Dejmal to have her sign it.

An appeal was taken and on April 28, 1978, this court issued an order instructing the trial court to make and enter specific findings of fact as to whether there existed a confidential relationship between Julia Dejmal and Alice Merta and whether there were suspicious circumstances giving arise to a rebuttable presumption of undue influence in the execution of the will. Such findings were to be entered *nunc pro tunc* as of November 11, 1977.

Pursuant to this court's order, the trial court filed a supplemental memorandum opinion, findings of fact and conclusions of law. It stated that, although Julia Dejmal trusted and confided in Alice Merta, there was no confidential relationship. With respect to the second finding it was instructed to make, the trial court stated that there "obviously were unusual circumstances" surrounding the execution of the will but that they were sufficiently explained to prevent any finding of undue influence.

Appellants first contend that the will of Julia Dejmal is invalid because Catherine Pechacek, one of the witnesses to it, was a minor at the time it was executed.

Catherine Pechacek was nineteen years old on December 13, 1968, and was employed as an assistant x-ray or lab technician at the hospital at which Julia Dejmal was a patient. She had completed her education and lived by herself a short distance from the hospital.

Despite these facts, appellants argue that because Catherine Pechacek had not yet attained the age of majority under the law as it then existed, she was not competent to serve as a witness to a will. From this they conclude that the will must fail for lack of two competent witnesses.

There is no merit to this argument for the reason that the statutes do not require a witness to a will to be a legal adult. The qualifications for witnesses are set out in sec. 853.07, Stats., of the Probate Code. Sec. 853.07 (1) provides as follows:

"853.07 **Witnesses.** (1) Any person who, at the time of execution of the will, would be competent to testify as a witness in court to the facts relating to execution may act as a witness to the will. Subsequent incompetency of a witness is not ground for denial of probate if the execution of the will is otherwise satisfactorily proved."

Although sec. 853.07(1), Stats., was not in effect at the time the Julia Dejmal will was executed, the legislative comment to that section indicates that it represents no change from prior law. Furthermore, even if sec. 853.07(1) was a change in prior law, it would still control here because, under sec. 851.001, ch. 853 applies to the will of any testator who died on or after April 1, 1971, unless the testator lacked testamentary capacity at the time of its enactment and never regained that capacity for a period of at least six months.[1] Because Julia Dejmal died after April 1, 1971, and there is no evidence that she lacked testamentary capacity at that time, it follows that sec. 853.07(1) is applicable.

[1] Sec. 851.001 provides in pertinent part: ". . . Chapter 853 is effective as to the will of any testator dying on or after April 1, 1971, except that it is inapplicable to a will executed prior to the publication of the chapter if it is proved the testator lacked testamentary capacity at the time of the enactment, unless the testator subsequently regained capacity to make a valid will and had the capacity for a period of 6 months; . . . ."

Applying that section here, then, there is clearly no basis upon which the trial court could have found Catherine Pechacek incompetent to serve as a witness to Julia Dejmal's will. Other than her age, appellants have presented no evidence to support their contention that she was incompetent to act as a witness. Certainly nineteen is not such a tender age that it would preclude one from testifying in court to the facts relating to execution of a will. Particularly in view of the fact that, although a minor, Catherine Pechacek was fully emancipated and well educated at the time the will was executed, there was no reason for the trial court to find her incompetent as a witness.

Appellants next argue that the testimony of Francis Johnson regarding his conversation with Catherine Pechacek in which she allegedly admitted signing the will in the home of her parents rather than in the hospital should have been accepted over that of Alice Merta and Lucille Pechacek. Johnson, they contend, had no interest in the estate of Julia Dejmal and therefore it was error for the trial court to reject his testimony for that of the others. They ask this court to reverse the trial court's finding that the will was properly witnessed as against the great weight and clear preponderance of the evidence.

The issue raised by this argument is simply one of credibility of the witnesses. As this court has frequently stated, it is not our function to review questions as to weight of testimony and credibility of witnesses. These are matters to be determined by the trier of fact and their determination will not be disturbed where more than one reasonable inference can be drawn from credible evidence. *Valiga v. National Food Co.*, 58 Wis.2d 232, 244, 206 N.W.2d 377 (1973); *Estate of Rich*, 26 Wis.2d 86, 88, 131 N.W.2d 909 (1965). Such deference to the trial

court's determination of the credibility of witnesses is justified, the court has said, because of ". . . the superior opportunity of the trial court to observe the demeanor of witnesses and to guage the persuasiveness of their testimony." *Kleinstick v. Daleiden,* 71 Wis.2d 432, 442, 238 N.W.2d 714 (1976). Thus, the trial judge, when acting as the factfinder, is considered the "ultimate arbiter of the credibility of a witness," and his finding in that respect will not be questioned unless based upon caprice, an abuse of discretion, or an error of law. *Posnanski v. City of West Allis,* 61 Wis.2d 461, 465, 213 N.W.2d 51 (1973).

It is clear from a reading of the trial court's memorandum opinion filed in this case that its determination of the credibility issue was based upon just those considerations which this court has said justified the deference accorded it on such questions. The trial court specifically referred to the vagueness of Johnson's testimony with respect to time, place and circumstances of his alleged conversation with Catherine Pechacek and his demeanor on the witness stand. Indications of a lack of truthfulness such as ". . . the flushing of his face at critical points of his testimony, extensive hesitation prior to answering certain questions and vagueness thereafter. . . ." are just the kind of factors which the trier of fact is uniquely in a position to take note of and upon which it is entitled to base its finding as to a witness' credibility.

In addition, the trial court referred to the facts that Johnson had been "jilted" by Catherine Pechacek, that he was acquainted with other relatives opposing the will who had first contacted him about testifying, and that he had contacted Catherine Pechacek after his first appearance at the hearing and jokingly referred to a "big pay off" in connection with the will contest as further

support for its rejection of his testimony. Based upon all these factors, the trial court concluded that Johnson had either intentionally lied or grossly misconstrued any conversation he may have had with Catherine Pechacek. Its conclusion is not based upon caprice, an abuse of discretion, or an error of law and must therefore stand.

Appellants next argue that even if the testimony of Alice Merta and Lucille and Catherine Pechacek is accepted it still follows that the will was not properly executed because neither of the witnesses was a doctor or nurse as Attorney Senn had instructed, and Julia Dejmal neither declared her will in the presence of the witnesses, nor did she expressly ask them to serve as witnesses. Considering all of these facts together, appellants contend, it is inconceivable that the will was properly and legally executed.

In *Estate of White*, 273 Wis. 212, 214, 77 N.W.2d 404 (1956), the court stated:

". . . The form of wills and the requirements for legal execution thereof are subject to legislative control. It is the policy of the courts to sustain a will as legally executed if it is possible to do so consistently with the requirements of the statute. This court has no power to substitute its judgment for that of the legislature as to the essentials of a will and it cannot lower the statutory requirements prescribed, nor can it add any other conditions."

The formal requirements for the valid execution of a will have been set out in sec. 853.03 of the Wisconsin Statutes. That section reads as follows:

"853.03 **Execution of wills.** Every will in order to be validly executed must be in writing and executed with the following formalities:

"(1) It must be signed (a) by the testator, or (b) in the testator's name by one of the witnesses or some other person at the testator's express direction and in his presence, such a proxy signing either to take place or to

be acknowledged by the testator in the presence of the witnesses; and

"(2) It must be signed by 2 or more witnesses in the presence of the testator and in the presence of each other."

Sec. 853.03, Stats., contains no requirement that, when a testator is hospitalized, one of the witnesses to the will must be a member of the medical profession. Nor does it require the testator to expressly declare the document to be his will or to specifically ask the proposed witnesses to sign in that capacity. *See Will of Zych,* 251 Wis. 108, 112–13, 28 N.W.2d 316 (1947), and *Will of Wnuk,* 256 Wis. 360, 365, 41 N.W.2d 294 (1950). Thus, the facts that neither of the witnesses to the will was a doctor or nurse, and that Julia Dejmal did not expressly state to Lucille and Catherine Pechacek that the document she was signing was her will and expressly ask them to sign as witnesses do not, in and of themselves, render the execution invalid.

There remains the question of whether the trial court's finding that the will was not procured by undue influence is sufficiently supported by the evidence.

The court has repeatedly said that undue influence must be proved by clear, satisfactory and convincing evidence and a finding by the trial court on the issue will not be upset on appeal unless it is against the great weight and clear preponderance of the evidence. *In re Estate of Fechter,* 88 Wis.2d 199, 214, 277 N.W.2d 143 (1979); *Estate of Hamm,* 67 Wis.2d 279, 282, 227 N.W. 2d 34 (1975).

From this it follows that the court's task on appeal is to "examine the record, not for facts to support a finding the trial court did not make or could have made, but for facts to support the finding the trial court did make." *Id.*

■

Prior decisions by the court have established two distinct methods by which an objector to a will may challenge its admissibility on the grounds of undue influence.

The first is by proving the four elements which this court has said show undue influence. Simply stated these are: susceptibility, opportunity to influence, disposition to influence, and coveted result. Stated more fully, they include: "1. A person who is susceptible of being duly influenced by the person charged with exercising undue influence; 2. the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another; 4. a result caused by, or the effect of such undue influence." *Will of Freitag*, 9 Wis.2d 315, 317, 101 N.W.2d 108 (1960); *In Matter of Estate of Becker*, 76 Wis.2d 336, 347, 251 N.W.2d 431 (1977). Although the burden is on the objector to prove each of these elements, because of the secrecy which usually attends such affairs, the court has followed a practice of requiring only slight evidence of the fourth when the first three have been established. *Id.*

The second method of challenging a will on grounds of undue influence involves the establishment of only two elements. They are: (1) a confidential relationship between the testator and the favored beneficiary and (2) suspicious circumstances surrounding the making of the will. *In re Estate of Kamesar*, 81 Wis.2d 151, 159, 259 N.W.2d 733 (1977); *Will of Faulks*, 246 Wis. 319, 360, 17 N.W.2d 423 (1945).

In *In re Estate of Fechter, supra*, 88 Wis.2d at 219, the court described the procedural operation of the second method as follows:

". . . When the objector proves the existence of both elements by clear and satisfactory evidence, a rebuttable

presumption of undue influence is raised. The burden of going forward with the evidence then shifts to the proponent of the will. If rebutting testimony is introduced the inference still persists, but a trier of the facts is not required to accept the inference and may reject it and accept the rebutting evidence. However, one need not contradict the evidentiary facts giving rise to the inference but may introduce such facts as would permit the rejection of the inference of undue influence." *See also Estate of Komarr,* 46 Wis.2d 230, 241, 175 N.W.2d 473 (1970), certiorari denied 401 U.S. 909.

Appellants contend that regardless of which method is applied, the evidence clearly shows that Julia Dejmal's will was the result of the undue influence exerted upon her by Alice Merta, and that the trial court's finding to the contrary is against the great weight and clear preponderance of that evidence.

The trial court concluded generally that there was no undue influence, but did not specifically state which of the elements appellants had failed to prove.

Despite this difficulty, however, a reading of the record indicates that a finding against appellants on at least three of the four elements of that test is not against the great weight and clear preponderance of the evidence. At most, only a finding that Alice Merta lacked the opportunity to unduly influence Julia Dejmal would have been so contrary to the evidence as to require a reviewing court to reject it. There is ample evidence to support findings against appellants on the elements of susceptibility, disposition and coveted result.

█ With respect to the issue of a testator's susceptibility to undue influence, the court has stated that the factors to be considered are the person's age, personality, physical and mental health and ability to handle business affairs. *In re Estate of Kamesar, supra,* 81 Wis.2d at 159. If consideration of these factors demonstrates that the testator was unusually receptive to the suggestions

of others and consistently deferred to them on matters of utmost personal importance, then the first element is established. *Estate of McGonigal,* 46 Wis.2d 205, 213, 174 N.W.2d 256 (1970).

Appellants contend that consideration of each of the relevant factors leads to the inescapable conclusion that, at the time her will was executed, Julia Dejmal was susceptible to the undue influence of Alice Merta. They assert that she "was an elderly lady, did not have a dominant personality, was physically ill, suffering from mental depression from the loss of her son, and certainly not a business woman capable of handling her financial affairs." Thus, they conclude, she was clearly susceptible to the influence of Alice Merta.

The record supports appellants' assertion as to only two of the factors—Julia Dejmal was relatively elderly and, at the time the will was executed, she was physically ill. But how physically ill she was at that time, and whether her illness was such as would affect her ability to make her own decisions, are by no means clear from the record. Although Julia Dejmal was hospitalized at the time, it appears from Mrs. Merta's testimony that this was simply because of some congestion in her lungs and at the suggestion of her doctor. Appellants offered no further evidence as to her condition while she was in the hospital and, in view of the fact that she was out of bed standing near the window when Alice Merta first entered her room with the will, it seems doubtful that her condition was so severe as to significantly effect her ability to freely decide for herself.

The appellants contend, on the basis of the testimony of Daphne Thompson, Attorney Senn's legal secretary, that Julia Dejmal had a rather weak personality and was easily manipulated by other people. Mrs. Thompson testified that prior to the deaths of her husband and son, Julia Dejmal would accompany them to Attorney Senn's

office but that she would always defer to them or to her attorney on matters of business.

However, the fact that she normally deferred to her husband, adult son or attorney on matters of business does not prove a susceptibility to undue influence by another party in the drawing of her will. Moreover, Mrs. Thompson's testimony was in sharp contrast with that of her former employer who, based upon his direct contact with Julia Dejmal for a period of over ten years in which he served as attorney for her and her family, described her personality as follows:

"She was a person who was strong-willed in the sense she knew what she wanted and she set out to get it, and while she appeared to be quiet, when she made up her mind it was exceedingly difficult to change it or to influence her in any way."

Attorney Senn also testified that Julia Dejmal understood the financial affairs of her family and took charge of them following the death of her son. The additional fact noted by the trial court in its opinion that Julia Dejmal had been appointed personal representative of her son's estate only two weeks prior to the execution of her will further weakens this claim that Julia Dejmal was incapable of handling her financial affairs.

With respect to the mental health of Julia Dejmal, there is simply no evidence that it was anything other than normal. Although she may have been grieving over the loss of her son some three months earlier, as Mrs. Thompson also asserted, this fact does not demonstrate a lack of mental health.

Thus, there remains only the fact of Julia Dejmal's age. At the time the will was executed in 1968 she was seventy-six years old. Following her short stay in the hospital in December of that year, she lived another four and one-half years before she died on November 24, 1973. Although seventy-six is an age at which the faculties

and senses of some persons may begin to fail, the appellants have produced no evidence which would tend to show that Julia Dejmal was so affected by her age. By itself, the fact that she was seventy-six years old at the time the will was executed is of little significance. It is hardly such as would require a finding by the trial court that Julia Dejmal was susceptible to undue influence.

Similarly with respect to the elements of disposition and coveted result, findings to sustain a conclusion of no undue influence would not be contrary to the great weight and clear preponderance of the evidence.

Disposition to influence, the court has said, "means more than a desire to obtain a share of the estate, it implies grasping and overreaching, and a willingness to do something wrong or unfair." *In re Estate of Evans*, 83 Wis.2d 259, 282, 265 N.W.2d 529 (1978).

Likewise, the element of coveted result has been said to signify more than simply a result favorable to the person who is alleged to have exerted undue influence. The essential question is whether that person has, for no apparent reason, been favored in the will to the exclusion of a natural object of the testator's bounty. *In re Estate of Kamesar, supra,* 81 Wis.2d at 162; *In re Estate of Evans, supra,* 83 Wis.2d at 284.

As to each of these elements, the record before the court reveals a complete lack of evidence. Appellants contend that the fact that Alice Merta actively promoted the execution of the will by itself demonstrates that she had the disposition to unduly influence Julia Dejmal. They argue that it shows grasping and overreaching characteristics and a willingness to do something wrong or unfair.

However, the relevant testimony was that, although Alice arranged for the formal drafting and execution of the will, she did so at the express request of Julia

Dejmal, just as she also assisted Julia in numerous other matters. Alice Merta testified, and the trial court apparently believed, that it was Julia herself who took the initiative in having a will drawn. The fact that she asked the person to whom she intended to leave her estate to help her does not show a wrongful disposition on the part of that person.

Nor does the fact that the entire estate was left to Alice and her husband to the exclusion of the remaining heirs demonstrate a coveted result. The record contains no evidence that any of these heirs ever took any real interest in Julia or her family, or attempted to be of assistance to them. Appellants even now in their brief make no claim that they maintained any relationship with Julia while she was alive, but state only that she "never showed animosity" toward them.

According to the undisputed testimony of Alice Merta, on the other hand, she and her husband had always kept in contact with Julia and, particularly after the death of her son, had helped her on a daily basis in whatever way they could. In light of this testimony it is not unnatural or unexpected that she and her husband would be named sole beneficiaries under Julia's will.

Thus, findings against appellants as to the elements of coveted result and disposition, as well as the element of susceptibility are sufficiently supported by the evidence. It therefore cannot be said that, under the first method of proof, the trial court's general finding of no undue influence is against the great weight and clear preponderance of the evidence.

As stated above, the second method of challenging a will on grounds of undue influence is by establishing (1) a confidential relationship between the testator and the favored beneficiary, and (2) suspicious circumstances surrounding the making of the will. If the ob-

jector proves both elements by clear and satisfactory evidence a rebuttable presumption of undue influence is raised and the burden of going forward with the evidence to rebut the presumption shifts to the proponent.

The trial court in its supplemental opinion found that although there were "unusual circumstances" surrounding the execution of the will that these circumstances were clearly explained and have not effectuated suspicious or unusual results and that no undue influence was established.

While it can be said the evidence here could establish a confidential relationship and suspicious circumstances surrounding the making of the will, we believe the evidence in the record is clearly sufficient to rebut any presumption of undue influence.

The trial court stated as a part of its findings:

"I am satisfied under all of the circumstances that Alice Merta did not attempt nor did she exert any undue influence over Julia Dejmal at the time of the execution of the Will in question. Julia Dejmal was in total control of her own life based on her character, nature, lifestyle, method of conducting business, quite naturally accepted and encouraged the kindness, and assistance received from her niece, Alice Merta and her husband. The entire file clearly indicates to this Court that the document in question was in fact the Last Will and Testament of the deceased, that it was properly executed and that it disposed of her property in a fashion just exactly the way she wanted and that Julia Dejmal was under absolutely *NO* undue influence from Alice Merta, when the will was executed."

▋▋▋▋▋

These findings are supported by the evidence and the order admitting the will to probate must be affirmed.

The appellants also contend that the trial court abused its discretion in ordering them to pay respondents' costs attributable to the continuance as a condition of granting

the continuance for the purpose of allowing appellants to further depose Catherine Pechacek.

The respondents correctly point out that that order has not been appealed from and is therefore not before the court. In any event, in view of the fact that the sole reason for the continuance being ordered was to permit appellants to present evidence which they had failed to obtain by the time of the hearing, the trial court's order seems well within the bounds of propriety.

*By the Court.*—Order affirmed.