State of Wisconsin, Plaintiff-Respondent,
v.
Pablo Martin Rios, Defendant-Appellant.
No. 02-2258-CR.
Court of Appeals of Wisconsin.
Opinion Filed: February 24, 2004.
Before Wedemeyer, P.J., Fine and Curley, JJ.
¶1. PER CURIAM.
Pablo Martin Rios appeals from a judgment entered after he pled guilty to possession of five hundred grams or fewer of tetrahydrocannabinols with the intent to deliver. See Wis. Stat. § 961.41(1m)(h)1 (2001-02).[1] Rios claims that the trial court: (1) erred when it denied his motion to suppress evidence because he did not voluntarily consent to a warrantless entry and search of his house; (2) erroneously exercised its discretion when it limited his cross-examination of a witness at the suppression hearing; and (3) erred when it denied his motion to suppress his confession because it was coerced. We affirm.

I.
¶2. While on patrol, two City of Milwaukee police officers saw a man, whom they later identified as Pablo Martin Rios, sitting on the porch of a house. The officers stopped to talk to Rios about drug activity that was reported to have taken place near the house. When the officers got to the front door, Rios was gone, so they rang the doorbell. Rios came to the door and let the officers in after they explained why they were there. While Rios was getting identification from his bedroom, an officer saw marijuana on top of a dresser and arrested Rios. After searching Rios's bedroom, the officers found more marijuana under the bed.
¶3. Rios confessed to a police detective. In that confession, he told the detective that he sold marijuana and that he had purchased the marijuana found under the bed two days before his arrest. Rios subsequently filed a motion to suppress the evidence recovered from the house, claiming that the warrantless entry into the house and search of his bedroom violated the Fourth Amendment's prohibition against unreasonable searches and seizures. See State v. Griffith, 2000 WI 72, 236 Wis. 2d 48, 613 N.W.2d 72 (Fourth Amendment prohibition against unreasonable searches and seizures). He also moved to suppress his confession on the ground that it was "the result of undue pressure and coercion."
¶4. The trial court held a hearing. Officer Christopher Edersinghe testified that on June 7, 2001, he and his partner were on routine patrol when they saw a man, whom Edersinghe identified at trial as Rios, sitting on the porch of a house. Edersinghe claimed that he wanted to talk to Rios because a citizen had given him a videotape that showed a man who looked like Rios engaging in "suspicious activity" in the alley behind the house. The officers parked their car and walked up to the front door of the house. Rios was no longer on the porch, so they knocked on the door and rang the doorbell.
¶5. According to Edersinghe, when Rios came to the door, Edersinghe identified himself as a Milwaukee police officer and told Rios that he was investigating possible drug dealing from the house. Edersinghe then asked Rios if he had any identification so that he would know to whom he was talking. Rios told Edersinghe that he had identification in his bedroom. Edersinghe asked Rios if someone could get Rios's identification for him. Rios told Edersinghe there was no one else in the house. Edersinghe asked Rios if the officers could go with Rios to get it. Edersinghe testified that Rios "invited us in and said sure." According to Edersinghe, Rios then turned around and led the way to a bedroom in the basement. Edersinghe testified that he did not draw his weapon, threaten Rios, or handcuff him when he asked if the officers could enter the house.
¶6. Edersinghe testified that he could smell burnt marijuana in the basement and that, from the doorway of Rios's bedroom, he saw what appeared to be loose marijuana on a dresser. Edersinghe asked Rios if the marijuana was his and Rios said that it was. Edersinghe testified that Rios appeared calm and cooperative. Edersinghe then told Rios that he was under arrest and asked Rios if he had any marijuana on him. Rios told Edersinghe that there was marijuana under the bed. Edersinghe looked under the bed and found two scales and a "big bag" of what he suspected was marijuana.
¶7. After Rios was arrested, he was taken to the Milwaukee Police Station where Detective Thomas Casper interviewed him. According to Casper, Rios was calm and cooperative and appeared to understand what was going on. Casper testified that he gave Rios two cups of coffee, a candy bar, and six cigarettes. Casper also testified that he did not threaten Rios or make any promises to him during the interview.
¶8. Rios offered a different version of the officers' visit to his house. He testified that after the officers asked for identification, he left them on the porch and went downstairs by himself to get it. When he got back upstairs, the officers were in the house. Rios claimed that the officers asked if they could stand there and he felt that he had no choice but to say yes. Rios testified that the officers then told him that they needed to see where he got his identification from. He told them that he got it from his bedroom and the officers followed him downstairs. Rios claimed that when the officers entered his bedroom they started "poking at my ceiling tiles and just snooping around." According to Rios, the officers arrested him after they found the marijuana under his bed.
¶9. Rios also gave a different version of the interview with Casper. Rios testified that Casper became "aggressive and vulgar" when he told Casper that the marijuana was only for his personal use. Rios also claimed that the only reason he signed the statement was because Casper told him that he could go home if he signed it.
¶10. The trial court denied Rios's motion to suppress the evidence. It found "the testimony of Officer Eder[]singhe and Detective Casper credible" and "the defendant's vers[ion] unreasonable and not credible." It also denied Rios's motion to suppress his confession, concluding that it was voluntary.

II.

A. Consent
¶11. Rios appears to claim that the trial court erred when it denied his motion to suppress the evidence because he did not voluntarily consent to the warrantless entry into his house and search of his bedroom.[2] Warrantless searches are presumptively unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347, 357 (1967). Consent is one of the recognized exceptions. Id. at 358 n.22.
¶12. The State has the burden to prove by clear and convincing evidence that the defendant voluntarily consented. State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794, 802 (1998). "Whether consent was given and the scope of the consent are findings of fact that we will not overturn unless clearly erroneous." State v. Garcia, 195 Wis. 2d 68, 75, 535 N.W.2d 124, 127 (Ct. App. 1995). The legality of a search, including whether a person's consent for a warrantless search was voluntary are matters of law that we review de novo. Phillips, 218 Wis. 2d at 191-195, 577 N.W.2d at 799-801.
¶13. To determine whether Rios's consent was voluntary, we must engage in a two-step analysis. First, there must be an indication, oral or otherwise, that consent was given. Id., 218 Wis. 2d at 196-197, 577 N.W.2d at 802. Second, we must consider whether Rios's consent was voluntarily given. Id., 218 Wis. 2d at 197, 577 N.W.2d at 802.
The test for voluntariness is whether consent to search was given in the absence of duress or coercion, either express or implied. We make this determination after looking at the totality of the circumstances, considering both the circumstances surrounding the consent and the characteristics of the defendant. No single criterion controls our decision.
Id., 218 Wis. 2d at 197-198, 577 N.W.2d at 802 (citations omitted).
¶14. The first step of the test is satisfied by the trial court's implicit findings that Rios consented to the officers' entry and search. See Schneller v. St. Mary's Hosp. Med. Ctr., 162 Wis. 2d 296, 311-312, 470 N.W.2d 873, 878-879 (1991) (a trial court's finding of fact may be implicit from its ruling). First, the trial court found credible Edersinghe's testimony that he asked Rios if the officers could come into the house and Rios said yes:
Officer Eder[]singhe had asked if he could come into the house, and the defendant invited the officers in. The defendant said sure.
Defendant turned around and led the officers to what Officer Eder[]singhe believed was his bedroom.
....
With respect to the officer  Also with respect to the arrest and how they entered, I believe Officer Eder[]singhe's testimony was reasonable.
The determination of witness credibility is left to the trial court, Dejmal v. Merta, 95 Wis. 2d 141, 151-152, 289 N.W.2d 813, 818 (1980), and Rios has not shown that these findings are clearly erroneous. From these findings, it is clear that the police obtained Rios's consent to enter. Rios explicitly granted the police consent to enter the house when he told them they could come in without qualification. Moreover, Rios essentially led the police from the doorway to his bedroom. His movement led the way and thereby tacitly conferred consent for the police to stand in the doorway to his bedroom. See State v. Douglas, 123 Wis. 2d 13, 19-20, 365 N.W.2d 580, 583 (1985) (consent implied from conduct).
¶15. Second, the trial court found credible Edersinghe's testimony that, after he saw the marijuana on the dresser and told Rios that he was under arrest, he asked Rios: "[I]s there any other marijuana on you? And he said, no, there was  he directed me to the fact that there was some underneath the bed." Rios's response tacitly conferred consent for the police to retrieve the marijuana hidden under the bed. Edersinghe specifically asked Rios if he had any drugs on his person. In response, Rios volunteered the additional information, not responsive to the question asked, that there was marijuana under the bed. Thus, the trial court's implicit finding that Rios consented to the search is not clearly erroneous because Rios was not asked if there were drugs in the room.
¶16. The second step of the test for consentthat it be voluntarily givenis also satisfied. Our independent review of the record reveals no evidence of duress or coercion. Edersinghe testified that Rios appeared calm and was cooperative. See Phillips, 218 Wis. 2d at 201, 577 N.W.2d at 803-804 ("cooperation and assistance evince both the non-threatening nature of the encounter and the voluntariness of [the] consent"). Moreover, Edersinghe testified that he did not draw his weapon or threaten Rios. The trial court found credible this testimony and again Rios does not show how this finding is clearly erroneous. See Dejmal, 95 Wis. 2d at 151-152, 289 N.W.2d at 818. A reasonable fact finder could conclude that Rios voluntarily gave the officers consent to enter the house and his bedroom. See Florida v. Bostick, 501 U.S. 429, 434-438 (1991) (absent police coercion, a person's mere subjective perception does not vitiate the voluntariness of consent).
¶17. Rios complains that his consent was not voluntary, however, because the police did not tell him that he had a right to withhold consent. We disagree. Although the failure to inform a defendant that he or she can refuse to consent to a search weighs against a determination of voluntary consent, it is not the only factor in the analysis and does not require a finding of involuntariness. State v. Hughes, 2000 WI 24, ¶47, 233 Wis. 2d 280, 607 N.W.2d 621; see also United States v. Drayton, 536 U.S. 194, 207 (2002) (knowledge of right to refuse consent is but one factor to be considered in the totality-of-the-circumstances analysis). As we have seen, several factors indicate that Rios's consent was voluntary. The fact that the police did not inform Rios he had a right to refuse consent does not overcome the other factors.
¶18. We also reject Rios's argument that his consent was involuntary because the police did not advise him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), "at any time in the house." The Miranda analysis does not control in this case because "consent to search is not testimonial or communicative in nature, even if the consent leads to the discovery of incriminating evidence." State v. Turner, 136 Wis. 2d 333, 351-353, 401 N.W.2d 827, 836 (1987). The proper analysis is whether the defendant's consent was voluntary under the Fourth Amendment. Id., 136 Wis. 2d at 353, 401 N.W.2d at 837. As we have seen, the facts as found by the trial court, indicate that Rios's consent was voluntary.

B. Cross-Examination
¶19. Rios also alleges that the trial court erroneously exercised its discretion when it limited his cross-examination of Edersinghe. At the hearing, Rios's lawyer tried to cross-examine Edersinghe by asking Edersinghe if he had a warrant to search the house. The State objected and the trial court ruled that the question was not relevant: "it's not relevant. There was no warrant obtained. The State concedes no warrant was obtained. It is not relevant to this motion." We agree.
¶20. Cross-examination is limited to material or relevant matters. Rogers v. State, 93 Wis. 2d 682, 689, 287 N.W.2d 774, 777 (1980). Rios alleges that on cross-examination, he would have elicited testimony from Edersinghe that Edersinghe was in Rios's house one week earlier in response to an alarm and saw marijuana on a dresser. Rios contends that this alleged testimony would have been relevant to show that a warrant was required. This claim is without merit. We know of no case, and Rios does not point us to one, which requires the police to obtain a warrant when they intend to go to a house and ask for identification because they have allegedly seen drugs in the house one week earlier.
¶21. Rios claims that the alleged testimony he would have elicited from Edersinghe about Edersinghe's prior visit to his house also would have been relevant to show that Edersinghe's reason for going to Rios's house and asking Rios for identification was pretextual. This claim also lacks merit. Edersinghe's motivation for going to Rios's house is irrelevant. "As long as there was a proper legal basis to justify the intrusion, the officer's subjective motivation does not require suppression of the evidence." State v. Baudhuin, 141 Wis. 2d 642, 651, 416 N.W.2d 60, 63 (1987). As we have seen, the officers had Rios's consent to enter and search.

C. Confession
¶22. Finally, Rios appears to allege that his confession was coerced because: (1) Casper put pressure on him to sign it; and (2) Casper told him that he could go home if he signed it. Again, we disagree.
¶23. "In determining whether a confession was voluntarily made, the essential inquiry is whether the confession was procured [through] coercive means or whether it was the product of improper pressures exercised by the police." State v. Clappes, 136 Wis. 2d 222, 235-236, 401 N.W.2d 759, 765 (1987). Whether a confession is voluntary under the totality of the circumstances requires a balancing of the personal characteristics of the defendant against the coercive or improper police pressure. State v. Pheil, 152 Wis. 2d 523, 535, 449 N.W.2d 858, 863 (Ct. App. 1989). "However, we do not reach this balancing unless there is some improper or coercive conduct by the police." Id.
¶24. In this case, the trial court found that the detective did not threaten or promise anything to Rios: "He was not threatened. He was  No promises were made to him that if he made the statement he could go home." The evidence presented at the hearing supports this conclusion-Casper testified that he did not threaten Rios or make any promises to him during the interview. The only evidence Rios presents to the contrary is his testimony that Casper was "aggressive and vulgar" and told Rios that he could go home if he signed the confession. As we have seen, the trial court found incredible Rios's testimony. Rios has not shown how this finding is clearly erroneous. Without more, there is no evidence of police coercion. The trial court properly denied Rios's motion to suppress his confession.[3]
By the Court.Judgment affirmed.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] Any sub-issue mentioned by Rios in his briefs and not discussed in this opinion was inadequately briefed. See State v. Waste Mgmt. of Wis., Inc., 81 Wis. 2d 555, 564, 261 N.W.2d 147, 151 (1978) ("An appellate court is not a performing bear, required to dance to each and every tune played on an appeal."); State v. Pettit, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992) (appellate court may "decline to review issues inadequately briefed").
[3] Rios also alleges that his confession should be suppressed under the fruit-of-the-poisonous-tree doctrine because it was not sufficiently attenuated from the alleged "prior police misconduct." See Wong Sun v. United States, 371 U.S. 471 (1963) (fruit of the poisonous tree). This claim fails because, as we have seen, the police did not engage in any "misconduct" when they entered Rios's house and searched Rios's bedroom.