Northern Clearing, Inc., Plaintiff-Respondent,
v.
Larson-Juhl, Inc., Defendant-Appellant.
No. 04-0010.
Court of Appeals of Wisconsin.
Opinion Filed: September 21, 2004.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶1 PER CURIAM.
Larson-Juhl, Inc., appeals a judgment awarding $211,037.66 damages, plus costs and prejudgment interest, to Northern Clearing, Inc. Larson-Juhl argues: (1) Northern's subcontract prohibited damages for delay; (2) the trial court erroneously awarded Northern damages on a theory of quantum meruit; (3) the court applied an erroneous measure of damages and miscalculated damages; and (4) Northern is not entitled to prejudgment interest. We affirm the judgment.

Standard of Review
¶2 Quantum meruit is an equitable remedy. Baierl v. McTaggart, 2001 WI 107, 245 Wis. 2d 632, 635 n.1, 629 N.W.2d 277. The decision to grant equitable relief is addressed to trial court discretion. Zinda v. Krause, 191 Wis. 2d 154, 175, 528 N.W.2d 55 (Ct. App. 1995). "Because the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions." Schneller v. St. Mary's Hosp. Med. Ctr., 155 Wis. 2d 365, 374, 455 N.W.2d 250 (Ct. App. 1990), aff'd, 162 Wis. 2d 296, 470 N.W.2d 873 (1991). Therefore, we must look to the record to determine whether the trial court undertook a reasonable inquiry and examination of the facts, and whether the record discloses a reasonable basis for the trial court's decision. Hedtcke v. Sentry Ins. Co., 109 Wis. 2d 461, 471, 326 N.W.2d 727 (1982). In the exercise of discretion, a trial judge may reach a conclusion which another judge or court may not reach. Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).
¶3 When reviewing the facts the trial court relied upon in reaching its discretionary decision, we do not overturn the facts found unless clearly erroneous. Michael A.P. v. Solsrud, 178 Wis. 2d 137, 153, 502 N.W.2d 918 (Ct. App. 1993). Our role is to search the record for evidence to support the findings the trial court made, not for evidence to support findings the court could have but did not make. In re Estate of Dejmal, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980). When the trial judge is the finder of fact and there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility. Gehr v. Sheboygan, 81 Wis. 2d 117, 122, 260 N.W.2d 30 (1977).

Facts 
¶4 With these standards in mind, we turn to the facts of record supporting the trial court's determination. Larson-Juhl retained Nelson Surveying to provide surveying services for the construction of a new manufacturing facility. Larson-Juhl also contracted with C.E. Doyle, LLC, a general contractor, to build the facility. Doyle subcontracted with Northern to do excavation, clearing and grading.
¶5 At the commencement of the project, Nelson placed the grading stakes in a manner that later was determined to be erroneous. The first day that Northern was on the job, Northern's project manager, Dale Brevak, asked Michael Pero of Nelson to check his stakes because they did not look right. Pero checked them, but said that they were placed correctly. Brevak continued to voice his concern to Ed Schueler, Doyle's project supervisor, and Phil Wisner, the plant manager of Larson-Juhl. Finally, Schueler halted the project to re-survey it. Schueler gave Brevak a corrected plan and asked Brevak to work on it as soon as possible.
¶6 Phil Wisner testified that after the excavation had started, he had addressed the grade problems with Brevak, who advised he was following the surveyor's stakes. To resolve the issue, Wisner drove out to the site to halt the excavation until the problem could be identified. At the site, he met with Brevak, Nelson, and Schueler, who had already decided that the project needed to be halted to determine the cause of what was determined to be a grade discrepancy.
¶7 Schueler testified at trial,
A lot of times there is a situation comes on a job and you have to take care of it immediately. And in the area you're working in, it needs to be cut out right away, the equipment is there, it's the most reasonable way to do it is right away.
....
If you set it aside and come back to it, it usually cost more. And most people understand that. So that's why sometimes a verbal thing to proceed is necessary.
¶8 At a meeting, Chuck Doyle indicated that he was "willing to go along with whatever it was going to take to get the job done.... They encouraged us to keep on going because there was some possible liability down the road with other subcontractors that may be delayed by us not completing our part of the job." Brevak did not recall discussions regarding quantities of material or prices. He explained that typically, however, extra work due to unforeseen conditions was done on a time and material basis. Brevak believed that C.E. Doyle, LLC, would obtain a change order from Larson-Juhl to compensate Northern.
¶9 Wayne Cameron, an engineer at Larson-Juhl, testified that he brought the problem of the grade discrepancy to Brevak's attention. He stated that the amount of fill was too large in comparison to the amount of cutting that was needed. He stated that he "continued to question" Brevak. He testified that he met with Schueler and determined that "something was really wrong based on how much fill has been taken off the site ...."
¶10 Doyle testified, "The agreement was that he would proceed and at some time, when it was documented or when it was realized what really the extent of the job would be, he would at that time submit a change order." No change order was presented at that time, because there "was no damage amounts at that time." He explained: "If he didn't provide those services then there probably would be other damages that we would have to address and that's about all we knew at that point."
¶11 Although Richard Vernon, the president of Northern, had asked for assurance of payment for the extra work, Doyle "couldn't authorize any written authorization for the work that was done wrong because at the time that it was done wrong I wasn't even sure what parties were guilty of what." He later learned that Northern had nothing to do with the staking error. Doyle further testified "the problem seems to be that Nelson's survey didn't take that into account when they staked the project, that we were using the old DOT number that they provided to us."
¶12 The entire site consisted of approximately seventeen acres that had to be cleared, stripped of topsoil, regraded and reshaped. The footprint of the building itself was approximately three to four acres. Due to the staking error, the site was re-staked and approximately seventy percent of the seventeen-acre site needed to be re-filled to raise the elevation by two feet.
¶13 The trial court found that the general contractor, C.E. Doyle LLC, entered into a subcontract with Northern to perform excavating and grading service for $134,500. The court found that Nelson set up stakes with incorrect information and that Northern relied on the stakes, resulting in more material being removed than the building plans specified. When the error was detected, the work stopped temporarily. Northern did much more work than had been originally contemplated by refilling, compacting and regrading the worksite. There is no claim that Northern was not entitled to rely on Nelson's stakes.
¶14 The court found: "Although unintentional, the outcome of the mistake was that the surveying firm hired by the defendant [Larson-Juhl] hindered or interfered with the plaintiff's [Northern's] work." The court found that the parties modified their contract by mutual assent. "Although the parties did not agree in advance on a specific price for idle time, there was a promise to pay a reasonable value." The court found that Northern was entitled to recover $157,080 for the extra work incurred because of the staking error.
¶15 Also, the court concluded that Northern "may recover under the theory of quantum meruit for extra work requested of it by the defendant [Larson-Juhl]." The court found that Northern "performed the work at the request of the defendant or defendant's contractor, that the work was performed in a workmanlike manner, and that a reasonable value was charged for the work." The court found that Northern was entitled to recover $53,957.66 for extra work performed.
¶16 Northern brought this action for compensation for labor, materials and services on a theory of quantum meruit and unjust enrichment. Northern contended its claim was based upon implied contract. After a two-day trial to the court, judgment was entered in Northern's favor in the sum of $271,948.38, including damages, prejudgment interest and statutory costs.

Discussion

1. Damages for delay
¶17 Larson-Juhl argues that Northern was not entitled to recover damages for delay because its subcontract with Doyle prohibited recovery of damages for delay. Thus, it contends that the portion of the damage award for delay was erroneous. We disagree.
¶18 Larson-Juhl is not a party to Northern's contract with Doyle. In addition, the trial court found, in effect, that Larson-Juhl hindered and interfered with Northern's performance of its excavation duties. Although unintentional, Larson-Juhl's retention of Nelson resulted in the staking error, causing a change of conditions unanticipated by any of the parties. The court was entitled to conclude that this changed condition relieved Northern of its obligations under its subcontract with Doyle. See Wm. Beaudoin & Sons, Inc. v. Milwaukee County, 63 Wis. 2d 441, 448, 217 N.W.2d 373 (1974).
¶19 Also, the clause would not be enforced when delays were caused by orders "detrimental to the contractor and which were the result of inexcusable ignorance or incompetence on the part of the engineer." John E. Gregory & Son, Inc. v. A. Guenther & Sons Co., 147 Wis. 2d 298, 304-06, 432 N.W.2d 584 (1988) (citation omitted). The staking errors fall within this category. In any event, the trial court was entitled to accept testimony that the modified contract eliminated the contract clause prohibiting recovery for damages resulting from delay. Therefore, the provisions of Northern's contract with Doyle do not govern the outcome of this dispute. As a result, any prohibition against damages for delay is not controlling.

2. Quantum Meruit
¶20 Larson-Juhl argues that the court should not have based its award on quantum meruit because Northern failed to prove that Larson-Juhl requested the services due to the staking error and in addition to the initial contract.[1] Larson-Juhl contends that Northern contracted exclusively with Doyle and, therefore, Larson-Juhl should not be held liable for any work Northern performed. We are unpersuaded.
¶21 We reject Larson-Juhl's contention that "There is no evidence which established that Larson-Juhl requested Northern to perform extra services due to the staking error or that it requested Northern to remain at the project site during the shut-down." While no express request may have been articulated, the court was entitled to find an implied contract based upon the parties' conduct and the circumstances of the transaction. "[A]t the liability phase of a quantum meruit action, the plaintiff must prove the existence of an implied contract to pay the plaintiff the reasonable value of his services." Ramsey v. Ellis, 168 Wis. 2d 779, 790, 484 N.W.2d 331 (1992). "A contract implied in fact may arise from an agreement circumstantially proved, but even an implied contract ... must arise under circumstances which show a mutual intention to contract." Theuerkauf v. Sutton, 102 Wis. 2d 176, 183-85, 306 N.W.2d 651 (1981). In order to recover under quantum meruit, "there must be sufficient competent evidence in the record which shows that the services were performed at the instance of the person to be charged and that the performer expected reasonable compensation." Gename v. Benson, 36 Wis. 2d 370, 376, 153 N.W.2d 571 (1967).
¶22 Contrary to Larson-Juhl's suggestion, recovery on quantum meruit does not require an agreement as to the details of the transaction. For example, in Mead v. Ringling, 266 Wis. 523, 528, 64 N.W.2d 222 (1954), our supreme court stated:
During the conversations, the parties never agreed in definite and certain terms on just what was to be done, when it was to be done, or upon many other details .... However, where a party has rendered services to another, even though it is under an invalid and unenforceable contract, he may recover for those services upon quantum meruit, upon an implied promise of the defendant to pay for the reasonable value of the services.
¶23 Here, sufficient competent evidence supports the court's findings. Contrary to Larson-Juhl's assertion, Northern's discussions relative to extra work and the shutdown were not solely with Doyle. Wisner, the manager of Larson-Juhl, testified that he spoke a number of times with Brevak concerning the problems with the grade. He testified that he decided that project needed to be shut down and drove to the site with Cameron, Larson-Juhl's engineer, specifically for that purpose. When they arrived, Wisner and Cameron met with Brevak and Schueler. They eventually agreed that Northern would proceed promptly to remedy the problem caused by the staking error. Northern proceeded with the excavation and its services were accepted by Larson-Juhl without objection.
¶24 The court could accept Wisner's and Schueler's testimony, as well as exhibits, indicating that Larson-Juhl participated in discussions with Doyle and Northern regarding excavation changes and extra work. Based on the parties' conduct, the court could infer that the parties modified their original contract and subcontract. Due to the circumstances of the transaction, the court could infer that Northern's services occasioned by the staking error and outside the scope of the original contract were not voluntary or gratuitous but performed at Larson-Juhl's instance, thereby entitling Northern to fair compensation. See Stack Constr. Co. v. Chenoff, 28 Wis. 2d 282, 287, 137 N.W.2d 66 (1965) (There is an implied promise to pay under quantum meruit the reasonable value of the services involved in cutting 107,000 cubic yards of soil.); see also Fieldhouse Landscape, Inc. v. Gentile, 12 Wis. 2d 418, 107 N.W.2d 491 (1961) (An implied promise on part of homeowners to pay for landscaping arose where landscaper furnished materials and performed labor at the homeowners' request.).[2]
¶25 Larson-Juhl points to conflicting evidence and argues its version of the facts. It complains that Doyle's name was on invoices and that Brevak believed that Nelson's errors and omissions insurance carrier was responsible for payment. It is a trial court, not appellate function to resolve the conflicting testimony. Estate of Dejmal, 95 Wis. 2d at 154. Larson-Juhl also argues that it should only be liable for certain change orders that it had specifically approved. The trial court was entitled to reject this argument based upon evidence that change orders were sometimes not used by the parties because of the difficulty in predicting costs.

3. Damages
¶26 Next, Larson-Juhl argues that the trial court erroneously awarded damages. It argues that the analysis provided by Dan Doyle as to the extra costs incurred due to the staking error was more credible. However, the trial court found, "Brevak would have had the best opportunity to see what had been completed and determine what yet needed to be done." As Larson-Juhl itself acknowledges in a later portion of its brief, "It was necessary for the trial court to resolve factual issues in order to determine the amount of damages.... The court resolved these factual disputes by accepting Northern's computations[.]"[3] Because we defer to the trial court's assessment of weight and credibility, Larson-Juhl's challenge to the weight and credibility of the testimony is rejected. WIS. STAT. § 805.17(2).[4]
¶27 Next, Larson-Juhl contends that the trial court erroneously awarded a double profit to Northern for certain aspects of its damages. Larson-Juhl relies on testimony of Richard Vernon, Northern's president, who explained that the unit price contained a ten percent profit margin. Larson-Juhl contends that Northern's secretary testified that she added an additional ten percent profit margin on the invoice she prepared. Larson-Juhl claims that this results in double profits in the damage award.
¶28 Because the trial court was entitled to discredit the secretary's testimony regarding profits, the record fails to support Larson-Juhl's claim of error. See WIS. STAT. § 805.17(2). The record discloses that Vernon testified as follows:
The Court: Have you relied on a unit price for certain aspects of damages?
Mr. Vernon: We took the $2.35 unit price because that was the price used  established in the original payment. ...
The Court: And do you know how that would compare to other companies in the same industry in the same area charging?
Mr. Vernon: I think that's a fair price. I mean, how we determine that price is if it's ... a shorter haul, it's less. It's divided into your times, yardage, to come up with cubic yard price based upon how long your haul is.
The Court: To the best of your knowledge is that consistent with the prevailing price in the community?
Mr. Vernon: Ya.
....
The Court: Do you know whether a specific profit margin is factored into that price?
Mr. Vernon: Yes.
The Court: Do you know what the profit margin is?
Mr. Vernon: Ten percent.
¶29 Northern's secretary also testified as to damages. On crossexamination, she stated that she multiplied the number of cubic yards by the unit price of $2.35 and added $55,000.[5] She further stated, "There is also profit in there" of ten percent. She explained that she was unaware that the $2.35 unit price also included a ten percent profit and testified as follows:
Q. [Counsel]: Okay. So, if that's correct and you added ten percent profit, then you're adding 20 percent, would that be correct?
A. [Witness]: Yes.
Q. [Counsel]: And that wouldn't be consistent with your business practices, right?
A. [Witness]: Correct.
¶30 On re-direct, she was asked:
Q. [Counsel]: [D]o you know if Northern Clearing has been paid everything  that it has been paid a total of $532,842.44, whether it would have realized a ten percent profit on this project? Do you know whether that would have occurred or not?
A. [Witness]: No, I don't know.
¶31 We conclude that the record fails to support Larson-Juhl's claim of error. "The measure of damages in such cases is the reasonable value of the materials furnished and labor performed." Fieldhouse Landscape, 12 Wis. 2d at 420.
Literally translated, the words "quantum meruit" mean "as much as he deserved" or "as much as he deserves." It would be difficult to embrace within one rule the measure of damages in all cases based upon a quantum meruit. From the record in this case, however, it appears that the work done by the plaintiff should be paid for at the customary rate of pay for such work in the community at the time the work was performed.
Mead, 266 Wis. at 529.
¶32 The court assessed the quantity of the work performed based on Brevak's testimony and the customary rate in the community based on Vernon's testimony. Because Northern's secretary indicated that she did not know whether Northern realized any profit, the trial court was not required to accept her testimony that the invoice reflected a twenty percent profit.[6]See WIS. STAT. § 805.17(2). Therefore, Larson-Juhl fails to demonstrate that the court's damages determination was erroneous for duplicating profit.[7]

4. Prejudgment interest
¶33 Larson-Juhl argues that the trial court erroneously awarded prejudgment interest because Northern's claims were not reduced to fixed dollar amounts and therefore were not liquidated. Northern disputes the merits of Larson-Juhl's argument and, alternatively, points out that this argument was not made before the trial court and therefore was not preserved for appellate review.
¶34 We conclude that Larson-Juhl has not preserved this argument for appellate review. As a general rule, we will not decide issues that have not first been raised in the trial court. Terpstra v. Soiltest, Inc., 63 Wis. 2d 585, 593, 218 N.W.2d 129 (1974). A party who appeals has the burden to establish "by reference to the court record, that the issue was raised before the circuit court." See State v. Caban, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) (citation omitted). Larson-Juhl has not indicated that this issue was raised before the circuit court. In addition, it does not reply to Northern's response that its argument is not preserved for appellate review. See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp., 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (arguments not refuted deemed admitted). Therefore, we decline to address the argument.
By the Court.  Judgment affirmed.
NOTES
[1] Larson-Juhl does not specifically argue that quantum meruit does not permit damages for delay.
[2] Larson-Juhl does not claim that it has paid for the outstanding sums claimed by Northern. Also, there is no contention that Doyle is liable to Northern for its excavation services occasioned by Nelson Surveying's inaccurate survey stakes. As a result, this case is not a typical dispute between a subcontractor, contractor and owner. See Annotation, Construction Contract Specifications, 6 A.L.R.3d 1394, § 3[c] (1966). The trial transcript discloses a settlement agreement was entered into between Nelson, Doyle and Larson-Juhl, indicating settlement would be made for any damage award to Northern.
[3] See Larson-Juhl's Appellate Brief, page 40.
[4] Larson-Juhl also argues that the trial court should have applied a measure of damages based upon unjust enrichment, rather than quantum meruit, and because it was not "enriched," the court erred. Larson-Juhl further argues that the trial court erred because Larson-Juhl never requested Northern to shut down or perform any services due to the staking error. It contends that Northern failed to prove a quantum meruit claim and never pled or proved an unjust enrichment claim. It claims that because no claim was proven, the damage award for extra services and delay must be reversed. This argument essentially reiterates preceding arguments. Because we concluded that the trial court properly determined that Northern established it was entitled to damages under a quantum meruit theory, we reject them.

All statutory references are to the 2001-02 version unless otherwise noted.
[5] Earlier testimony indicated that the sum of $55,000 represented the amount billed for the "shutdown."
[6] See State v. Echols, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993) (An implicit finding is sufficient when the facts of record support the trial court's decision.).
[7] Larson-Juhl also argues that the damage award is inconsistent in various respects with Northern's contract with Doyle. Quantum meruit is in equity and we rejected Larson-Juhl's contention that Northern's contract with Doyle controls.